Filed 5/16/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SIDNEY J. CORRIE, JR.,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>ELIZABETH SOLOWAY, as Trustee, etc.,<br>et al.,<br><br>     Defendants and Respondents. | A135963<br><br>(Contra Costa County<br>Super. Ct. No. P09-01129) |

     Appellant Sidney J. Corrie, Jr., petitioned the probate court to enforce an option he held to purchase a portion of a property owned by the Armand Borel Trust Dated June 20, 1994, as Amended and Restated in 2008 (Borel Trust or the trust). Respondents, successor trustee, Elizabeth Soloway, and trust beneficiary, the East Bay Regional Park District (the District), objected to the petition on the grounds that Corrie's option agreement with the trust was void and unenforceable for illegality in that it failed to comply with the Subdivision Map Act, Government Code[1] section 66410 et seq. (SMA). Following a separate trial on the issue, the trial court ruled in favor of respondents, finding that amendments to the option agreement executed by Corrie and a previous trustee to cure the illegality were ineffectual.

     Corrie contends the trial court erred as a matter of law in holding that no subsequent acts by the parties could revive the option agreement. We agree, and will reverse the trial court's orders on this issue.

---

     [1] All statutory references are to the Government Code unless otherwise indicated.

# I. BACKGROUND

Armand Borel was the settler and trustee of the Armand Borel Trust Dated June 20, 1994, a revocable trust. On June 14, 2004, Borel and Corrie entered into a "Real Property Option and Purchase Agreement" (the Option Agreement) pertaining to a 16.65-acre parcel of real property Borel owned in Danville, California (the Danville property). The Option Agreement granted Corrie a five-year exclusive and irrevocable option to purchase up to seven acres of the Danville property at a price of $500,000 per acre. In return for the purchase option, Corrie was required to pay Borel a nonrefundable option fee of $100,000 up front, plus another $5,000 per month during the option period. The Option Agreement provided that if the option was exercised, "Buyer shall purchase and Seller shall sell the Property on the terms and conditions set forth in this Agreement," and it included detailed provisions specifying buyer's and seller's covenants and conditions precedent to closing the sale, the deposits required to be made into escrow by buyer and seller, and the title company's duties at the closing. The Option Agreement also gave Corrie a right of first refusal to purchase "the balance of the [Danville property] that is not part of this Option Agreement." No language in the Option Agreement expressly conditioned a future sale of property subject to the option on compliance with the SMA.[2]

As required by the Option Agreement, Borel, individually and as trustee, and Corrie executed a "Memorandum of Option," incorporating the Option Agreement by reference, which was recorded on August 3, 2004.

On July 14, 2008, Borel executed a revised trust instrument, creating the Borel Trust. The Borel Trust provided that upon Borel's death the Danville property would be

---

[2] "The [SMA] 'generally requires all subdividers of property to design their subdivisions in conformity with applicable general and specific plans and to comply with all of the conditions of applicable local ordinances. [Citation.]' [Citation.] '. . . [T]he Act aims to "control the design of subdivisions for the benefit of adjacent landowners, prospective purchasers and the public in general." ' " (*Trinity Park, L.P. v. City of Sunnyvale* (2011) 193 Cal.App.4th 1014, 1028.) With certain exceptions, the SMA prohibits the sale of any parcel of real property for which a map is required, until a map in full compliance with its provisions has been filed. (§ 66499.30, subds. (a), (b).)

distributed to the District "so long as it used [*sic*] as and for an agricultural park." In the event the District could not create and operate such a park, the Borel Trust provided that the property would go to the City of San Ramon or the Town of Danville to create and operate the park.

In July 2008, Corrie was contemplating exercising the option. On July 24, 2008, Borel wrote a letter to the Town of Danville's planning director authorizing Corrie to proceed with a tentative parcel map application and the creation of a second parcel on the Danville property for all or any portion of the seven acres covered by Corrie's option. The 2008 transaction did not proceed, and Corrie continued to make option payments. On March 25, 2009, Borel and Corrie amended the Option Agreement to (1) extend the option period by one year to June 14, 2010; (2) increase the option fees from $5,000 per month to $10,000 per month; and (3) give Corrie the option to extend the option period to June 14, 2011, by payment of an additional $100,000 to Borel, which would count toward the purchase price of the property if Corrie exercised the option (Amendment No. 1). Corrie timely made the $100,000 payment required for extension of the option period until June 14, 2011.

In March 2009, Borel and Corrie entered into and recorded an agreement with a lender entitled "Subordination, Nondisturbance and Attornment Agreement Regarding Option and Right of First Refusal" (the subordination agreement). The subordination agreement recited that the lender had conditionally agreed to make a $1.4 million loan to Borel as trustee of the Borel Trust, secured in part by a deed of trust on the Danville property. The agreement generally addressed the relative rights and duties of Corrie, the lender, and the foreclosure purchaser in the event of a future foreclosure sale pertaining to the Danville property. A promissory note for $1.4 million secured by the property was recorded on April 14, 2009.

Borel died on April 19, 2009, and Noelle Flanagan became the successor trustee of the Borel Trust. At the end of April 2010, Corrie and Flanagan (as trustee) signed a writing, in the form of a letter addressed to Flanagan, stating: "The option agreement provides that the parties will fully cooperate with each other during the term of the

3

option.  In order to facilitate our parcel map application with the Town of Danville, we both need to acknowledge that the terms and conditions of the Option Agreement are incorporated . . . herein and allow Sidney Corrie, Jr. to proceed with an application for a parcel map, while the Borel Trust remains the record owner of the Property.  *Corrie and the Borel Trust also acknowledge that the obligations of each expressed in the Option Agreement are conditioned upon the approval and filing of a final subdivision map or parcel map as required pursuant to Government Code sections 66410 et seq.*"  (Italics added.)

On November 16, 2010, Flanagan and Corrie executed a document captioned "Amendment #2 to Real Property Option and Purchase Agreement" (Amendment No. 2).  The amendment recited that the Option Agreement had been amended on March 25, 2009 (Amendment No. 1) and on March 1, 2010 (the March 2010 letter agreement).  Amendment No. 2 extended the option period to June 14, 2013, in return for Corrie making "advance principal payments" totaling $500,000 over the succeeding five months, as well as continuing to pay monthly option fees, not applicable to the purchase price, at the higher rate of $14,286 per month, instead of $10,000 per month, until the option was exercised.  Further, Amendment No. 2 gave Corrie an option to purchase "an additional adjacent three acres" at $500,000 per acre, "thus bringing the total property subject to an option to purchase to ten acres."  Finally, Amendment No. 2 stated:  "All other terms and conditions of the Agreement and its amendments remain the same.  Seller and Buyer again acknowledge that the obligations of each expressed in the Agreement and its amendments are conditioned upon the approval and filing of a final subdivision map or parcel map . . . ."

In April 2011, the District, as a beneficiary of the restated Borel Trust, filed a probate petition to have Flanagan removed as trustee.  With Flanagan's authorization, Corrie filed a parcel map application with the Town of Danville on September 27, 2011.  In November 2011, he applied to the probate court for an order authorizing and instructing the trustee to join in the application and to execute a deed conveying the seven acres covered by the application, as the Town of Danville was requiring.  The District

4

opposed the application, stating that sale of the seven acres subject to the option at a below-market price would undermine or destroy its ability to operate and maintain an agricultural park on the Danville property by reducing the net monetary inheritance it would receive along with the land.

Flanagan died in December 2011, and in January 2012, Elizabeth Soloway was appointed as successor trustee of the Borel Trust. Soloway filed an objection to Corrie's petition shortly after becoming trustee. She requested a separate trial be held on the issue of whether the Option Agreement was void for failing to condition sale of the property on compliance with the SMA, and the District joined in that request. The trial court decided to proceed on that basis.

Following briefing and argument, the trial court ruled the Option Agreement was void and unenforceable. The court held (1) the agreement was void at its inception because it permitted the sale of a parcel of real property before the filing of a final subdivision or parcel map and without being expressly conditioned upon the approval and filing of such a map; and (2) subsequent acts by the parties, such as Amendment No. 2, were ineffective to revive its validity. The trial court denied Corrie's motion for a new trial, and this appeal followed.[3]

## II. DISCUSSION

Corrie contends the trial court erred in finding Amendment No. 2 and the March 2010 letter agreement ineffective to cure the original agreement's noncompliance with the SMA. Because the material facts are undisputed, the trial court's ruling presents a pure question of law which we review de novo. For the reasons discussed *post*, we agree with Corrie.

### A. *Applicable Statutory Law*

As relevant here, the SMA generally prohibits the *sale* of any parcel of real property for which a map is required, unless a map compliant with its provisions has been

---

[3] The orders are appealable under Probate Code section 1300, subdivisions (a) and (k).

5

filed:  "No person shall sell, lease, or finance any parcel or parcels of real property or commence construction of any building for sale, lease or financing thereon, except for model homes, or allow occupancy thereof, for which a final map [or parcel map] is required by this division or local ordinance, until the final map [or parcel map] thereof in full compliance with this division and any local ordinance has been filed for record by the recorder of the county in which any portion of the subdivision is located."  (§ 66499.30, subds. (a), (b).)[4]

Notwithstanding the foregoing prohibition, the SMA permits parties to offer or enter into contracts for the future sale of divided portions of land without first filing subdivision maps as long as such contracts are expressly conditioned on compliance with the SMA before the close of escrow:  " 'Nothing contained in [section 66499.30,] subdivisions (a) and (b) shall be deemed to prohibit *an offer or contract to sell*, lease, or finance real property . . . where the sale, lease, or financing . . . is expressly conditioned upon the approval and filing of a final subdivision map or parcel map, as required under this division.' "  (*Black Hills, supra,* 146 Cal.App.4th at p. 891, italics omitted; italics added.)  Thus, under section 66499.30, subdivision (e) (section 66499.30(e)), " '[e]ven though a final map or parcel map has not been recorded, a subdivider can enter into a contract to sell, lease, or finance, . . . on . . . a portion of a larger parcel of land *if the contract is conditioned expressly on the future approval and recordation of a final map or parcel map prior to the close of any escrow . . . .*' "  (*Black Hills,* at p. 891, quoting 9 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 25:147, p. 361, italics added.)  The SMA does not specify how such an express condition must be designed or phrased.

The principal purposes of the SMA include protection of both real estate buyers and the general public:  " 'The [SMA] has three principal goals: to encourage orderly

---

[4] " 'A final (subdivision) map is generally required for subdivisions of five or more parcels.  [Citations.]  A parcel map is generally required for the creation of four or fewer parcels.' "  (*Black Hills Investments, Inc. v. Albertson's, Inc.* (2007) 146 Cal.App.4th 883, 890 (*Black Hills*), quoting *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 564.)

6

community development, to prevent undue burdens on the public, and to protect individual real estate buyers. [Citations.]' [Citation.] 'By generally requiring local review and approval of all proposed subdivisions, the [SMA] aims to "control the design of subdivisions for the benefit of adjacent landowners, prospective purchasers and the public in general." [Citation.] More specifically, the [SMA] seeks "to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer." ' " (*Black Hills, supra*, 146 Cal.App.4th at p. 890.)

## B. *Preliminary Issues*

"An option is an offer by which a promisor binds himself in advance to make a contract if the optionee accepts upon the terms and within the time designated in the option." (*Simons v. Young* (1979) 93 Cal.App.3d 170, 182.) As a type of offer to sell real property, an option contract comes within the literal terms of section 66499.30(e). Since no subdivision map was filed when the Option Agreement was created in this case, the agreement was therefore subject to section 66499.30(e) *if* it contemplated any subdivision of the Danville Property.[5] Nonetheless, both sides put forward arguments they assert would allow this court to decide the appeal in their favor *without* reaching the issue of illegality. We address those threshold arguments first.

Corrie contends the trial court lacked jurisdiction to enter an order finding the Option Agreement and the subsequent amendments void because of the absence of a necessary party, Fremont Bank (Fremont), which held an unspecified security interest of some nature in Corrie's option. Fremont's motion for leave to intervene and for a new

---

[5] We note that subdivisions (a) and (b) of section 66499.30 by their terms only prohibit the *sale* of real property taking place before a map complying with the SMA has been filed; they do not literally prohibit the making of offers or contracts to sell real property before such maps are filed. However, viewed in conjunction with section 66499.30(e) it may be implied that the SMA prohibits the making of contracts and offers to sell unless expressly conditioned on SMA compliance before the sale is completed.

trial, filed *after* the court entered the subject order, was denied. We agree with the trial court that Fremont failed to demonstrate this was a proper case for intervention, its motion was untimely, and it was estopped by its prior conduct in expressing its willingness to waive notice from belatedly changing its position.

Corrie further contends the Option Agreement is ambiguous and could be construed to give him an option to purchase the entire Danville property, in which case SMA requirements might not apply to it. We are not persuaded. The first operative sentence of the agreement, entitled, "Grant of Option," states: "Subject to the terms and conditions of this Agreement [including certain recitals], Seller grants to Buyer an exclusive and irrevocable option . . . to purchase seven (7) acres of the Property for the Purchase Price set forth in Section 2 below." The agreement specifies no other purchase option. It does grant Corrie a right of first refusal to purchase the rest of the Danville property as follows: "Seller grants to Buyer a Right of First Refusal on the balance of the Property described in Exhibit A *that is not part of this Option Agreement*."[6] (Italics added.) The option grant and right of first refusal clause demonstrate unequivocally that the Option Agreement limited Corrie's purchase option to seven acres. Amendment No. 2 confirms the parties interpreted the original option as covering only seven acres. It gave Corrie an option to purchase "an additional adjacent three acres" at $500,000 per acre, "thus bringing the total property subject to an option to purchase to ten acres." An option to purchase an adjacent three acres would be unnecessary if Corrie already had an option to purchase the entire property. Although the Option Agreement sometimes used the defined term "Property" carelessly to refer both to the seven acres subject to the option and to the entire Danville property, we do not find the agreement as a whole is reasonably susceptible to the interpretation that it grants an option to purchase the entire property.

---

[6] A right of first refusal is not the same as an option contract. (See 1 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 2:10, p. 39.)

8

On very different grounds, respondents also maintain we need not reach the issues pertaining to illegality. According to respondents, we need not consider the potential curative effect of Amendment No. 2 because the amendment is void as a matter of trust law. Respondents assert (1) Flanagan breached her duties as trustee by executing Amendment No. 2; (2) the evidence shows Corrie was aware of the breach and was therefore not protected as an innocent party by Probate Code section 18100; and (3) the amendment must therefore be considered void under Probate Code section 16420, subdivision (a)(9). (See *Vournas v. Fidelity Nat. Tit. Ins. Co.* (1999) 73 Cal.App.4th 668, 673 [Prob. Code, § 18100 excuses third parties who deal with the trustee from investigating the trustee's powers except where they have actual knowledge of a breach of the trust]; Prob. Code, § 16420, subd. (a)(9) [authorizing trust beneficiaries to commence a proceeding to trace and recover property conveyed in breach of the trust].)

Amendment No. 2 included an indemnity clause in which Corrie promised to indemnify and hold the Borel Trust harmless "for matters arising out of this Agreement." Respondents insist the presence of this clause showed Corrie's knowledge that Amendment No. 2 "constituted a breach of trust that would deprive the [District] of its bequest." Respondents reason that Corrie's actual knowledge of this fact would void "[t]he purported conveyance of interest in real property as set forth in Amendment #2." We disagree. First, the clause does not demonstrate Corrie knew as a fact that Amendment No. 2 was a breach of trust. An indemnity agreement is not an admission of fault or liability. It shows at most Corrie was aware the District might object to and seek to litigate the option extension. There had certainly been no adjudication of such a claim. Moreover, the Borel Trust specifically confers broad powers on the successor trustee, including the power to grant options for the sale or exchange of trust property for any purpose, with or without prior court authorization. It is not clear why Corrie was required to ignore that express power. In fact, respondents make no showing based on the facts in the record before us that enforcement of Amendment No. 2 would in fact deprive the District of its bequest, or otherwise breach the trust. Without prejudice to the District's position in any further proceedings on this point, there is no basis in the present

9

record for this court to decide the breach of trust issue in favor of the District on this appeal.

## C. *Is the Option Void for Illegality?*

" 'The illegality of contracts constitutes a vast, confusing and rather mysterious area of the law.' " (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 344, quoting Strong, *The Enforceability of Illegal Contracts* (1961) 12 Hastings L.J. 347.)

The trial court held the March 2010 letter agreement and the parties' subsequent agreement reflected in Amendment No. 2 could not "revive" the illegal contract. In support of its holding, the court quoted the following language from *Stonehocker v. Cassano* (1957) 154 Cal.App.2d 732 (*Stonehocker*): "The subsequent conduct of the parties does not give validity to the sale made in violation of the law. If an agreement grows immediately out of an illegal act, a court will not lend its aid to enforce it." (*Id.* at p. 736.)[7] The trial court continued as follows: "In [*Black Hills*], a vendor's belated recordation of a parcel map after execution of the contract but before closing did not revive a void contract. Similarly here, an acknowledgement letter or amendment executed approximately six years after the execution of a contract would not revive a void contract. This latter conclusion follows from the established principle that the issue of legality or illegality is properly assessed at the time of sale. (*People v. Sidwell* (1945) 27 Cal.2d 121, 127.) A contrary conclusion would allow the SMA and its underlying public policies to be circumvented with ease."

---

[7] In *Stonehocker*, the plaintiff made a partial payment toward the purchase of escrowed stock in violation of the Corporation Commissioner's permit prohibiting the receipt of any consideration for the stock until the commissioner consented to such transaction. (*Stonehocker, supra*, 154 Cal.App.2d at pp. 733–734.) After the consent was obtained, the plaintiff deposited promissory notes for the balance due in escrow, which the defendants sought to enforce by way of cross-complaint in the plaintiff's action to rescind the stock purchase for illegality. (*Ibid.*) The defendants contended the delivery of the promissory notes after the commissioner consented to the transfer constituted an independent, valid purchase of the shares, making the notes enforceable. (*Id.* at p. 734.) The Court of Appeal rejected that argument, finding that the latter transaction grew "immediately out of an illegal act." (*Id.* at p. 736.)

The three cases cited by the trial court are distinguishable. In *Stonehocker*, unlike here, the parties took no action to correct the illegality of their original transaction such as by returning the initial payments and restructuring their agreement to condition payment of consideration on consent from the Corporation Commissioner to the sale. In *Black Hills*, although one party unilaterally and voluntarily recorded the necessary map before the sale closed, there was no attempt to rewrite the contract to meet the statutory requirement that recordation be an express condition of the contract. *People v. Sidwell* merely held that the test of the legality or illegality of the sale of a security cannot be the ultimate success or failure of the venture as determined after the sale. It does not stand for any general principle that legality or illegality is properly assessed at the time of sale. If it did exist, such a principle would work in favor of Corrie's position since there had been no sale nor even a contract of sale prior to the execution of Amendment No. 2, because Corrie had not yet exercised his option to purchase at that point.

With regard to the trial court's policy concerns, it is not at all clear that allowing parties to correct a technical violation in their option agreement by mutual consent would allow the SMA and its underlying public policies to be easily circumvented. Certainly no public policy forbids parties from abandoning a void, illegal contract, and entering a new, enforceable contract covering the same subject matter. (See *Boloyan v. Contente* (1952) 113 Cal.App.2d 439, 442 [direct purchase of property negotiated after an illegal straw purchase by a third party was abandoned did not carry any taint from the prior transaction]; *Wise v. Radis* (1925) 74 Cal.App. 765, 781 [recognizing doctrine that if the parties make a new, lawful contract settling their rights as between themselves after an illegal contract has been executed, the new contract is enforceable]; *In re Estate of Jackson* (1986) 508 N.Y.S.2d 671 [parties abandoned usurious contract and entered new, enforceable contract for the same loan amount on nonusurious terms].)

There is no bright line rule that the parties' subsequent conduct cannot save their intended transaction from illegality. In *Robbins v. Pacific Eastern Corp.* (1937) 8 Cal.2d 241 (*Robbins*), a seller and buyer of stock entered into an illegal executory contract for the sale of the stock in violation of the Corporate Securities Act. The California Supreme

11

Court nonetheless held that the subsequent issuance and sale of the stock in New York, where the transaction was legal, was not void: "[E]ven if it be assumed that the executory contract, so far as the seller . . . is concerned, was illegal, nevertheless, the performance and execution of the contract in New York, being legal there, and being complete in themselves, stand independently of the prior illegality." (*Robbins*, at p. 277.) The court further stated: "[I]t does not impair the validity of a sale when made that the prior contract to make it was illegal. This is so because the sale or executed contract may legally stand on its own feet, independent of the prior executory contract. [¶] These principles are well settled." (*Id.* at p. 279.)

*Moore v. Moffatt* (1922) 188 Cal. 1 (*Moore*), discussed with approval in *Robbins, supra*, 8 Cal.2d at pages 281–283, upheld the validity of a stock sale made pursuant to a stock subscription agreement that was deemed void at its inception for lack of a permit from the Corporation Commissioner. The permit had been granted before the stock was issued and sold. (*Moore*, at pp. 5–6.) The *Moore* court stated: "[T]he parties to the transaction could not, nor did they, as a matter of law, by their adoption of the [subscription] agreement ratify and thereby validate as of the time of its original making or any time thereafter an agreement which may have been void in the first instance. But the parties could, and we think they did, when the bar of the statute to the making and acceptance of a valid agreement had been removed, elect to adopt and accept and stand upon the subscription agreement already signed as embodying—even though it may have been ineffectual at the time it was signed—the terms and conditions of a new agreement by which their future dealings were to be governed." (*Id.* at pp. 6–7.)

*Waring v. Pitcher* (1933) 135 Cal.App. 493 (*Waring*), also discussed with approval in *Robbins*, involved shares of stock subscribed and paid for before a permit was secured, but delivered to the buyer after the permit was obtained. The court held: "[P]rior to the time of receiving and accepting the certificate appellant could have demanded the return of her money. . . . [H]owever, . . . as the corporation was in existence when the certificate was delivered to plaintiff and held a valid permit to issue stock at that time, appellant's act of accepting and retaining the certificate had the same

12

legal effect as a new and independent contract for the sale of the stock as of the time of such delivery." (*Waring*, at pp. 496–497.)

It is admittedly hard to reconcile *Robbins*, *Moore*, and *Waring* with *Stonehocker* and other cases that have taken a similarly expansive view of the effect of illegality. (See, e.g., *Bourke v. Frisk* (1949) 92 Cal.App.2d 23; *Miller v. California Roofing Co.* (1942) 55 Cal.App.2d 136.) Perhaps the best formulation of the approach courts should take in considering defenses based on illegality is found in *Norwood v. Judd* (1949) 93 Cal.App.2d 276 (*Norwood*)—a formulation that was cited with approval and applied by the California Supreme Court in *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199. (*Id.* at pp. 218–219 [recognizing *Norwood* had been followed in a long line of other Supreme Court and appellate cases].) *Norwood* states: "The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But the courts should not . . . blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied." (*Id.* at pp. 288–289.)[8]

The "realities of the situation" in this case convince us the option agreement between Corrie and the Borel Trust that is currently in effect is enforceable notwithstanding its relationship to the original 2004 Option Agreement which did not

---

[8] For recent cases applying this formulation see *Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1048–1049; *Schaffter v. Creative Capital Leasing Group, LLC* (2008) 166 Cal.App.4th 745, 754–755; *Maudlin v. Pacific Decision Sciences Corp.* (2006) 137 Cal.App.4th 1001, 1013–1014.

comply with section 66499.30(e). First, we find the parties' transactions in this case consisted in substance of two or possibly three severable option agreements, the last of which—reflected in Amendment No. 2—was not unlawful under section 66499.30(e). Although drafted as an amendment to the original 2004 Option Agreement, and incorporating its terms, Amendment No. 2 established a different option period than either the Option Agreement or Amendment No. 1, exacted a higher price for maintaining the option, added new option terms, and made additional property subject to the option. It was in substance a new and different option agreement relative to those reflected in the Option Agreement and Amendment No. 1. In our view, the parties created a "new and independent" option contract (*Waring, supra*, 135 Cal.App. at p. 496) that stood on its own feet independently of the prior illegality (*Robbins, supra*, 8 Cal.2d at pp. 277, 279). As more fully discussed below, the option agreement created by Amendment No. 2 satisfied the requirements of section 66499.30(e) notwithstanding that it incorporated the terms of the original option.

We believe this result is consistent with the *Norwood* criteria. First, no moral turpitude is implicated in this case. There is no evidence either party intended at any time to circumvent the law or that their transactions had an unlawful purpose. In fact, the parties first began the approval process for subdivision of the property before any contract of sale was formed, when Borel wrote a letter to the planning director in 2008 authorizing Corrie to proceed with a tentative parcel map application. The parties' failure to condition the original Option Agreement or the further option created by Amendment No. 1 on SMA compliance was nothing but a drafting oversight to which no moral opprobrium attached.

Second, neither the option created in 2004, nor the new option created by Amendment No. 1 in 2009, were ever exercised. No contract of sale or sale ever occurred under these instruments, no interest in the property was created or transferred, and no subdivision of the property—legal or illegal—ever took place. (See *Schmidt v. Beckelman* (1960) 187 Cal.App.2d 462, 468 [absent exercise or attempted exercise of an option, no binding agreement to convey an interest in real property comes into existence];

14

1 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 2:7 [an option is not a transfer of the title or any estate in the property].)  By their express terms, the original Option Agreement expired in June 2009, and Amendment No. 1 expired in June 2011.  Although both option agreements may have been illegal under section 66499.30(e), both are completed transactions fully performed on both sides in the sense that the buyer paid all option fees required to be paid and the seller held the offer open for the full option period.  As indicated in *Norwood*, it is difficult to see how the public would be protected by declaring that these completed transactions taint the option agreement Corrie is seeking to enforce.

Third, there is no question the trust will be unjustly enriched if Amendment No. 2 is not enforced.  Corrie's option payments have significantly enriched the trust, to the tune of $1,327,860, and we find nothing in the trial court's ruling to indicate Corrie would have a claim against the trust for the return of any part of this.  "In compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' " (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 292.)

Finally, concerning the "moral fault" criterion in *Norwood*, neither side can be held guilty of greater fault than the other for the deficiency in the Option Agreement and Amendment No. 1.  It was an error in drafting for which both sides are equally responsible, at least as far as can be shown on the record before us.  However, the Borel Trust, by granting potentially inconsistent rights concerning the property to Corrie and the District, and by acting erratically in first cooperating with Corrie to correct the deficiency in the earlier agreements, inducing him to expend more money on the option, and then repudiating his option rights, does bear greater fault than Corrie for the current litigation and for the harm to Corrie if the option is declared void.

In our view, the fundamental purpose of the rule barring the enforcement of illegal agreements would not be advanced by its application here.  In 2010, recognizing their earlier option agreements were legally defective, the parties mutually agreed to add a condition to their option agreement for the period beginning on June 14, 2011, intended

15

to correct the problem.  No discernible purpose of the SMA would be served by precluding them from doing so.  (Cf. *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1535–1536 [a party's *unilateral*, *unaccepted* offer to modify a contract cannot resuscitate a legally defective contract].)  While the parties may also have thought they could fix the problem retroactively to cover the earlier option terms that ran from June 14, 2004 until June 14, 2011, we do not believe the law permits that result.  We merely hold that the illegality of the former option agreements does not taint the option that came into effect on the latter date.

Notwithstanding the condition of SMA compliance the parties agreed to in Amendment No. 2, respondents maintain Amendment No. 2 was ineffective to create a lawful option agreement because it incorporated the terms of the original Option Agreement, which include certain waiver provisions that nullify the condition.  Clauses permitting waiver of SMA map requirements were found to invalidate real property purchase agreements in *Black Hills*, *supra*, 146 Cal.App.4th at pages 893–894, and in *Sixells, LLC v. Cannery Business Park* (2008) 170 Cal.App.4th 648 (*Sixells*) at pages 653–654, notwithstanding that the contracts in both cases otherwise purported to require SMA compliance as a condition of the sale.

We find both cases distinguishable.  The fatal clause in *Black Hills* required the seller to comply with the SMA but then provided the seller the option of *either* satisfying that condition *or* waiving it in writing, without liability.  (*Black Hills, supra*, 146 Cal.App.4th at p. 893.)  In *Sixells,* the contract allowed the purchaser to complete the contract if, at its election, a final map was recorded or it waived the recording.  (*Sixells, supra*, 170 Cal.App.4th at p. 653.)  The contract therefore allowed the sale to go through before any final map had been recorded.  (*Ibid.*)  The Option Agreement in this case contains no such right to waive SMA compliance.  The first waiver clause respondents point to in the Option Agreement, section 5.3, gives the buyer specified rights to either waive or obtain monetary consideration at closing for certain title exceptions set forth in the preliminary title report or otherwise discovered.  This language cannot reasonably be construed to encompass SMA compliance, which is not a title issue.

16

The second waiver clause respondents cite, section 7.3 of the Option Agreement, allows the buyer to waive one or more of the following "Buyer's Conditions" specified in section 7.2: (1) a material adverse development causing the seller's representations and warranties to be untrue at the time of closing; (2) a default in the seller's performance of its obligations under the Option Agreement; (3) the title company's reservation of any right not to issue a title policy; and (4) the pendency as of the time of closing of any litigation, appeal, or governmental proceeding materially affecting the buyer's proposed development of the property. In our view, this waiver clause does not in any way qualify or nullify the condition of SMA compliance required by Amendment No. 2. Unlike the waiver clauses in issue in *Black Hills* and *Sixells*, the presence of this clause would not permit a closing to occur without prior compliance with the SMA. Amendment No. 2 makes such compliance an express condition of *both parties'* entire obligations under the agreement. Under its language, there would be no effective option agreement absent compliance with the SMA. Such compliance is therefore not a "buyer's condition" like those specified in section 7.2 of the Option Agreement. It is also not one of the seller's representations and warranties which are enumerated in another part of the Option Agreement, nor can it be construed as an obligation of the seller. It is a condition of both parties' obligations, not a promise of performance by the seller. Obviously the SMA condition has nothing to do with the willingness of the title insurer to issue a title policy. Finally, although a "governmental proceeding" is required to obtain an approved map for recording, Amendment No. 2 conditions both parties' obligations on the approval and filing of such a map, which means no transfer of the property can occur as long as proceedings to obtain a recordable map are still pending. Section 8 of the Option Agreement makes closing of the sale "[s]ubject to the conditions set forth in this Agreement," which would include the SMA compliance condition created by Amendment No. 2. We find no provision of the agreement that would allow either party to waive that condition.

Section 66499.30(e) does not specify a particular form of words required to expressly condition a sale of real property on compliance with the SMA. We decline to

17

construe it as a trap for the unwary. The parties in this case used language obviously designed to track and comply with section 66499.30(e), not to evade it. "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) We therefore find that the option agreement created by Amendment No. 2 satisfied the requirements of section 66499.30(e).

Respondents further contend Amendment No. 2 is unenforceable because Corrie and Borel stipulated and agreed they would not modify the Option Agreement without the lender's written consent, and evidently no such approval was obtained. We do not believe the District or the successor trustee have standing to assert contract rights belonging to the lender. In any event, we do not read the clause in issue as giving the lender a right to have Amendment No. 2 declared unenforceable. At best, the lender could claim damages for breach.

For these reasons, we find the trial court erred by finding the option agreement in effect at the time of trial void and unenforceable. We reverse and remand the matter to the trial court for entry of a new order resolving the issue of enforceability in favor of Corrie. We imply no judgment as to any other issues and defenses raised by the successor trustee or the District.

## III. DISPOSITION

The orders appealed from are reversed, and the matter is remanded to the trial court with directions to enter a new order finding the option agreement as amended on November 16, 2010 was not void or unenforceable on grounds of illegality, and for further proceedings consistent with the views expressed in this opinion.

18

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Jenkins, J[*]


A135963
*Corrie v. Soloway*

_____

[*] Associate justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19

Trial Court:   Contra Costa County Superior Court

Trial Judge:   Hon. John H. Sugiyama

Counsel:

Gagen, McCoy, McMahon, Koss, Markowitz & Raines and Gregory L. McCoy for Plaintiff and Appellant.

Doyle Low, Michael J. Low, Jaime B. Herren for Defendant and Respondent Elizabeth Soloway.

Gordon, Watrous, Ryan, Langley, Bruno & Paltenghi, Bruce C. Paltenghi and Richard S. Bruno for Defendant and Respondent East Bay Regional Park District.