Filed 11/15/22  Counts v. Chadwick CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CALEB COUNTS et al.,<br><br>    Plaintiffs and Respondents,<br>v.<br>RHONDA CHADWICK,<br><br>    Defendant and Appellant. | A163282<br><br>(Solano County<br>Super. Ct. No. FCS048235) |

This litigation centers on a contract between defendant Rhonda Chadwick and plaintiffs Caleb Counts and Nathan Coleman (collectively, plaintiffs), under which Chadwick was to transfer control of a cannabis dispensary to plaintiffs.  She appeals from a judgment entered in plaintiffs' favor after a bench trial, claiming that reversal is required because she was improperly denied a continuance, the contract at issue was illegal and unenforceable, and the trial court erred by finding that plaintiffs were entitled to be placed on the dispensary's board of directors.  She also claims that the court abused its discretion in awarding attorney fees to plaintiffs. We affirm in full.[1]

---

[1] Plaintiffs filed a motion for sanctions against Chadwick and her appellate attorney on the basis that this appeal is frivolous.  The motion is denied.  Although we ultimately reject Chadwick's claims, they are not so clearly lacking in merit or made solely for the purpose of delay that sanctions

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND[2]

Chadwick operated a small cannabis dispensary in Vallejo, Homegrown Holistic Collective, Inc. (H2C), which was organized as a nonprofit mutual benefit corporation. In November 2015, she and plaintiffs entered a contract entitled Agreement for Transfer of Control (Agreement). Under the Agreement, plaintiffs promised to pay Chadwick a $20,000 deposit, and she promised to transfer control of H2C to them by November 15, 2015. Specifically, she promised to (1) "take all actions necessary" to replace H2C's board of directors with herself and plaintiffs and (2) amend H2C's bylaws to ensure plaintiffs held the majority of seats on the board of directors with "full authority to manage and operate [H2C]." Plaintiffs timely paid the deposit, but Chadwick did not replace the board of directors or amend the bylaws.

Under the Agreement, Chadwick also promised to "ensure that [H2C] submit[ted] to the City of Vallejo all required documentation, in accordance with the laws and ordinances of the City of Vallejo, to receive a Final Letter of Limited Immunity . . . from the City of Vallejo." In turn, plaintiffs were required to pay $150,000 to Chadwick within five days of H2C's receiving a limited immunity letter (an aspect of how Vallejo regulated marijuana businesses at the time), and an additional $300,000 "[u]pon the first anniversary" of the letter's receipt. Plaintiffs also promised to pay Chadwick $310,0000 upon H2C's receiving "from the City of Vallejo a certificate of occupancy" for the dispensary's planned new location. These additional

---

are justified. (See *Applied Business Software, Inc. v. Pacific Mortgage Exchange, Inc.* (2008) 164 Cal.App.4th 1108, 1119.)

[2] The underlying facts are primarily drawn from the trial court's two statements of decision.

2

payments were also conditioned on Chadwick's having "timely performed all of [her other] obligations" under the Agreement.

H2C received a limited immunity letter from Vallejo in October 2015, but the letter conditioned H2C's good standing on its "compliance with the Building Code, Fire Code[,] and ventilation requirement" at the new location by December 31, 2015. The building at the new location did not fully comply with these requirements until the following June, and plaintiffs did not make the additional payments required under the Agreement.

For several months after the Agreement was entered, "[p]laintiffs continued to act in good faith to perform [it] and expended significant sums to complete renovation of the building at the new location [for the dispensary], to purchase inventory, and to market and operate the business of H2C." During this time period, H2C "operated at a net loss." In October 2016, Chadwick and her husband "seized physical control of the H2C business building, inventory, assets[,] and business records, and excluded [p]laintiffs from operation and management of the business."

The following January, plaintiffs brought suit against Chadwick, her husband, and H2C (collectively, Chadwick defendants).[3] The operative complaint alleged claims for breach of contract, breach of the covenant of good faith and fair dealing, unfair business practices, declaratory relief, fraudulent transfer, and quantum meruit, as well as a cause of action under Corporations Code section 709 (section 709) to determine H2C's directors. Chadwick filed a cross-complaint against plaintiffs for declaratory relief.

---

[3] Vallejo Creative Solutions, LLC, a company associated with Counts, was also a plaintiff, but the parties' appellate briefing does not mention this entity. In addition, other defendants were named in the suit, but they are not parties to this appeal.

3

The trial court conducted a bifurcated bench trial in which the section 709 claim was tried first. In May 2020, the court issued a statement of decision on that claim, concluding that Chadwick breached the Agreement by failing to place plaintiffs on H2C's board of directors and amend the bylaws, and plaintiffs did not breach the covenant of good faith and fair dealing or waive any of Chadwick's breaches. Accordingly, the court ordered that H2C's board of directors now consisted of Chadwick and plaintiffs and that H2C's bylaws be amended to provide that plaintiffs had a majority of seats on the board and that the board "ha[d] the full authority to manage and operate the corporation."[4]

In April 2021, after the remaining causes of action were tried, the trial court issued a second statement of decision addressing them. The court ruled that Chadwick breached the Agreement but rejected plaintiffs' claims of fraudulent transfer and declaratory relief, as well as Chadwick's declaratory-relief claim. After accounting for plaintiffs' payment of the $20,000 deposit and other credits, the court awarded $720,039.68 to Chadwick, "conditioned upon [her] curing her breach by placement of [p]laintiffs on the [b]oard of [d]irectors of H2C and amendment of the [b]ylaws of H2C."[5] The court awarded plaintiffs $1,198,073.29 in attorney's fees and $223,533.83 in costs as the prevailing parties, resulting in a net monetary judgment of

_____

[4] Chadwick and her husband filed a petition for a writ of mandate in this court to challenge the May 2020 decision and a preliminary injunction effectuating the decision. We denied the petition for "fail[ure] to demonstrate that petitioners lack[ed] an adequate remedy at law and that [they would] suffer irreparable harm absent writ review." (*Chadwick v. Superior Court*, A160467.)

[5] Based on another provision of the Agreement, Chadwick was also awarded "one hundred twenty (120) pounds of 'sugar trim,' " and plaintiffs were ordered to donate $10 to her charity organization, House of Broken Dolly.

4

$701,567.44 against Chadwick. After unsuccessfully moving for a new trial, Chadwick appealed.

## II.
### DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion by Denying Chadwick's Request for a Six-month Continuance.*

Chadwick contends that the trial court abused its discretion by denying her a continuance to "substitute in her chosen attorney after she was abandoned by her first attorney on the eve of trial." The claim lacks merit.

1.    Additional facts

In early 2019, counsel for the Chadwick defendants moved to be relieved as counsel based on a conflict of interest, and the motion was calendared for that April. In March, the trial court held a hearing to consider the Chadwick defendants' ex parte motions to move up consideration of counsel's motion and to continue trial on the section 709 claim, which was also set for April.

At the March hearing, Chadwick indicated she would sign a substitution of attorneys, mooting her counsel's motion to be relieved, if the trial court would continue the trial for at least 90 days. One of the attorneys she proposed to retain, Mark Pappas, then stated that he and his partner were willing to become attorneys of record only if "the trial date [was] vacated, and no new trial [was] set at [that] particular time." Pappas explained that he was "booked up until at least October or November" on other cases.

The trial court responded that if it "grant[ed] a continuance, [it was] not going to be until October." The court subsequently vacated the trial date, indicating it would re-set it at a future hearing, and directed Chadwick and her husband "to not delay in obtaining new counsel to represent [them] in

5

this case." Our record reflects no further discussion of the issue, but within three weeks, a different attorney not affiliated with Pappas was representing the Chadwick defendants. Trial on the section 709 claim ultimately began in late October 2019.

### 2. Analysis

"To ensure the prompt disposition of civil cases, the dates assigned for a trial are firm. All parties and their counsel must regard the date set for trial as certain." (Cal. Rules of Court, rule 3.1332(a).) "[C]ontinuances of trials are disfavored" and cannot be granted except upon "an affirmative showing of good cause." (*Id.*, rule 3.1332(c).) Substitution of trial counsel may constitute good cause, "but only where there is an affirmative showing that the substitution is required in the interests of justice." (*Id.*, rule 3.1332(c)(4).) In determining whether to grant a continuance, a trial court "must consider all the facts and circumstances that are relevant to the determination," including the length of the requested continuance. (*Id.*, rule 3.1332(d).)

We review the denial of a continuance for an abuse of discretion. (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984.) Under this standard, we affirm the trial court's ruling if it "is based on a reasoned judgment and complies with legal principles and policies appropriate to the case before the court" and does not constitute a clear abuse of discretion. (*Id.* at pp. 984–985.) An appellant bears the burden "to demonstrate from the record that such an abuse has occurred." (*Id.* at p. 985.)

Chadwick claims the trial court abused its discretion by denying her a continuance so that she could obtain her chosen counsel. But as plaintiffs observe, the trial court vacated the trial date in response to her request, effectively continuing the trial. Thus, the complained-of ruling is more

6

accurately characterized not as the denial of a continuance but the refusal to continue the trial for six months, from April to October 2019.

Although this refusal meant that Pappas was unwilling to represent Chadwick, she cites no authority suggesting that the denial of a continuance to enable a party to retain a *particular* attorney constitutes an abuse of discretion. The decisions on which she relies found in favor of parties who were forced to represent themselves at trial after being denied a continuance of any length. (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1395; *Vann v. Shilleh* (1975) 54 Cal.App.3d 192, 197–198.) Chadwick, in contrast, quickly retained new counsel, who represented her during the rest of the proceedings below. As she offers no other reason that the trial court abused its discretion, we conclude it did not err by refusing to continue the trial for six months.

> B.     *Chadwick Fails to Demonstrate that the Agreement Was Unenforceable as an Illegal Contract.*

Chadwick claims that the Agreement was illegal and unenforceable because it violated various state and local laws. We disagree.

> 1.     Additional facts

Before the second phase of the trial, the Chadwick defendants filed a bench brief arguing that the Agreement was illegal because it violated Vallejo city ordinances in effect when it was entered that "prohibit[ed] the sale or transfer of a medical marijuana dispensary within [that] jurisdiction." The Chadwick defendants also argued that the Agreement was illegal because it violated the Compassionate Use Act of 1996 (CUA) (Health & Saf. Code, § 11362.5) and the Medical Marijuana Program Act (MMP) (Health & Saf. Code, § 11362.7 et seq.), in that "it was meant to generate a profit from operating a cannabis business."

7

After hearing argument from the parties, the trial court ruled that the Agreement was not an illegal contract. The court concluded that "nothing in the [state] statutes or the Vallejo ordinances . . . prohibit[ed] a transaction of this type," namely, "a contract to replace members on a board of directors." The court also held that even if the contract was illegal, it was nonetheless enforceable because the equities weighed in plaintiffs' favor.

### 2. Analysis

When the Agreement was entered in 2015, "[f]ederal law prohibit[ed] the use, possession, manufacture[,] and sale of marijuana," and California voters had not yet approved Proposition 64, which legalized recreational use of the drug. (*City of Vallejo v. NCORP4, Inc.* (2017) 15 Cal.App.5th 1078, 1081.) The CUA and MMP permitted medicinal use of marijuana, but the steps these statutes took to enable that use "were limited and specific." (*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 744–745.)

At the time, cannabis dispensaries were not a permitted land use in Vallejo. (See *City of Vallejo v. NCORP4, Inc.*, *supra*, 15 Cal.App.5th at p. 1082.) Earlier in 2015, Vallejo adopted an ordinance conveying " '[l]imited civil immunity' " on " 'existing medical marijuana dispensary operators that have obtained tax certificates and paid their quarterly taxes' to operate." (*Id.* at p. 1084.) Thus, at the time the Agreement was entered, the Vallejo Municipal Code provided, "It is unlawful for any person to cause, permit or engage in the cultivation, possession, distribution, exchange or giving away of marijuana or products containing marijuana in any form, for medical or non-medical purposes except as provided in this chapter, and pursuant to any and all other applicable local and state law. The prohibition includes renting, leasing, or otherwise permitting a medical marijuana dispensary to occupy or

8

use a location, vehicle, or other mode of transportation." (Former Vallejo Mun. Code, § 7.100.030(B).) Notwithstanding this prohibition, the ordinance provided that "a limited immunity shall be available and may be asserted as an affirmative defense" in any action by Vallejo to enjoin such activity. (*Id.*, § 7.100.050.) The ordinance also provided that "[n]o medical marijuana dispensary that is sold or transferred will receive limited immunity. Transfer is a change in principals, assignment of lease or sale of business asset other than a marijuana product." (*Id.*, § 7.100.100(A).)

A contract is illegal if it is "[c]ontrary to an express provision of law," including a local ordinance, or "[c]ontrary to the policy of express law, though not expressly prohibited." (Civ. Code, § 1667; see *Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1400.)[6] As a "general rule[,] . . . the courts will not grant relief under the terms of an illegal contract." (*Wong v. Tenneco* (1985) 39 Cal.3d 126, 138.) "In determining whether the subject of a given contract violates public policy, courts must rely on the state of the law as it existed at the time the contract was made." (*Moran v. Harris* (1982) 131 Cal.App.3d 913, 918.) Whether a contract is illegal is a question of law reviewed de novo. (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1126.)

Several exceptions exist to the rule that illegal contracts will not be enforced. (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 291.) As relevant here, "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant [i.e., the party seeking to avoid the contract] and a disproportionately harsh penalty upon the plaintiff [i.e., the party seeking to enforce the contract].' [Citation.] ' "In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of

---

[6] All further statutory references are to the Civil Code unless otherwise noted.

factors, including the policy of the transgressed law, the kind of illegality[,] and the particular facts." ' " (*Id.* at p. 292.)  Factors commonly considered include whether the defendant is part of "the group primarily in need of the [law's] protection," whether the contract is inherently immoral or inequitable, the relative sophistication of the parties, and which party is more at fault. (*Id.* at pp. 292–293.)

We need not decide whether the Agreement was illegal, because even if it was, Chadwick fails to demonstrate that the trial court erred by concluding it was nonetheless enforceable.  She focuses most of her appellate briefing on the Agreement's purported illegality, discussing the alternative ground for the court's ruling only in passing.  As to that ground, she claims that "[i]n applying the illegality of contract doctrine as a defense, courts do not consider whether its application results in unjust enrichment in favor of the party opposing enforcement of the contract" because the doctrine prioritizes the public interest over avoiding potential injustice between the parties.  True, the rationale for refusing to enforce illegal contracts is that " 'the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice between the parties.' " (*Asdourian v. Araj*, *supra*, 38 Cal.3d at p. 291.)  But as *Asdourian* and other cases make clear, despite this general principle the equities between the parties sometimes justify enforcing an illegal contract. (*Asdourian*, at p. 292; e.g., *Corrie v. Soloway* (2013) 216 Cal.App.4th 436, 449; *California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506, 1516.)

Chadwick also argues that the trial court improperly relied on cases applying this exception because they "are inapplicable and distinguishable from the case at bar."  She does not explain why they are inapposite, however, except to say that since plaintiffs "operated H2C at a loss[,] . . . no

10

benefit was conferred on [her]." In fact, Chadwick received $20,000 from plaintiffs, and when she took back control of H2C, they had invested a significant amount of money in the entity.

Moreover, in addition to the monetary benefit Chadwick realized, several other factors are relevant and weigh against her. These include whether the defendant has acted wrongfully, whether the defendant is part of the class of persons the law is meant to protect, and whether the contract was "malum in se ('immoral in character, inherently inequitable or designed to further a crime or obstruct justice')" or merely "malum prohibitum ('only voidable depending on the factual context and the public policies involved')." (*California Physicians' Service v. Aoki Diabetes Research Institute*, *supra*, 163 Cal.App.4th at pp. 1516–1517.) On the latter point, the trial court observed that California's public policy against marijuana "has been eroded significantly over the years, commencing virtually at the time that this contract was entered into," and that "contracts relating to marijuana and the sale of businesses [are] becoming very acceptable." Chadwick does not explain why the court's balancing of this and other factors was erroneous. As a result, we conclude she is not entitled to relief on this claim.

C.  *Chadwick Fails to Show that the Agreement Was Unenforceable for Other Reasons.*

Next, Chadwick argues that the Agreement was also unenforceable because it was (1) unauthorized under H2C's bylaws, (2) not ratified by H2C's board of directors, and (3) the product of undue influence. We reject these claims.

In making her first argument, Chadwick relies on two "Defendants' Trial Exhibits" that include H2C's bylaws and articles of incorporation. We agree with plaintiffs that we cannot consider these documents because there is no indication they were admitted into evidence. Chadwick responds that

11

they were lodged and "before the Trial Court in [her] new trial motion and by law are part of the record on appeal." But whether a document is part of the record on appeal is not the same issue as whether we may consider it as evidence of the Agreement's invalidity. Moreover, not only does Chadwick fail to show that these exhibits were ever admitted at trial, she also fails to show that they were submitted or considered in connection with her motion for a new trial. In fact, the exhibits and the motion for a new trial appear nowhere near each other in her appellant's appendix, which purports to be in chronological order. Nor is there a file stamp on the exhibits, and the appendix's table of contents lists their date as "NA." In short, it is unclear whether these exhibits were ever properly presented to the trial court, and we thus reject Chadwick's argument based upon them.

For the same reason, we also reject Chadwick's contention that the Agreement was invalid because it was not ratified by H2C's board of directors. Chadwick claims that because "the bylaws and articles of H2C are largely silent on board and member powers," it must be true that "[t]he business affairs of H2C are . . . the sole province of the board and the members." Since we decline to consider H2C's bylaws and articles of incorporation for the reasons given above, the premise of this argument is unsupported. Accordingly, the argument fails.

Finally, Chadwick argues that the Agreement was a product of undue influence upon her by plaintiffs' "agent," a person she claims introduced her to plaintiffs and participated in the contract negotiations. She did not clearly raise this claim until her motion for a new trial, which the trial court summarily denied. But even assuming that she preserved the issue, she fails to show entitlement to relief.

12

"Undue influence is a contract defense based on the notion of coercive persuasion," and the party raising the defense generally has the burden of proof. (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 284; § 1575; see *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 911.) Whether a contract is the product of undue influence is a question of fact. (See *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1033.) " 'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) Rather, the question is more properly characterized as " 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ibid.*)

Thus, even if we assume that the trial court rejected the undue-influence claim on its merits, to succeed on appeal Chadwick would have to demonstrate that the evidence compelled a finding in her favor. She utterly fails to do so, citing only evidence purportedly favorable to her without addressing any evidence that would support the court's implicit finding. As a result, we reject this claim as well.

D.     *The Trial Court Did Not Err by Concluding that Plaintiffs Were Entitled to Be Placed on H2C's Board of Directors.*

Chadwick contends that the trial court erred by granting plaintiffs relief on their section 709 claim and placing them on H2C's board of directors. Specifically, she claims that the court erred by concluding that (1) the October 2015 letter from Vallejo did not qualify as a "Final Letter of Limited Immunity" under the Agreement's terms, meaning that plaintiffs' obligation

13

to pay her $150,000 was not triggered, and (2) plaintiffs were not obligated to make payments under the Agreement "despite receiving the benefit of their bargain in operating the business." (Some capitalization omitted.) We are not persuaded.

As the trial court found, "[d]uring the pendency of this action, H2C was converted to a for-profit corporation to which . . . [section] 709 applies to rights of directorship." That provision authorizes an equitable cause of action "to determine the validity of an election of corporate directors." (*Morrical v. Rogers* (2013) 220 Cal.App.4th 438, 442, 451.) In a section 709 proceeding, a trial court may " 'determine all questions which may affect the validity of a contested election,' " including the meaning of an underlying contract. (*Id.* at pp. 455–456, italics omitted.) We review issues of contract interpretation de novo. (*City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1438–1439.)

First, Chadwick claims the term "Final Letter of Limited Immunity" was ambiguous and the trial court should have construed it to include the October 2015 letter, because otherwise three "other provisions in the Agreement" would be "render[ed] meaningless": the provision that Chadwick's husband be removed from the board "upon execution of [the] Agreement," the provision that $150,000 was due within five days of the immunity letter's receipt "but not sooner than November 1, 2015," and the provision that $310,000 was due within five days after H2C received a certificate of occupancy for the new location. Chadwick does not explain *why* any of these provisions cannot be reconciled with the court's contractual interpretation. Moreover, even if the October 2015 letter did qualify as a "Final Letter of Limited Immunity," plaintiffs' obligation to pay the $150,000 was expressly contingent upon Chadwick's performing *other* duties she failed to discharge, including replacing the board of directors and amending H2C's

14

bylaws. Accordingly, she has not demonstrated that the court erred by determining that plaintiffs did not breach the immunity-letter portion of the Agreement.

Second, Chadwick claims that plaintiffs' obligation to make additional payments was not excused by her failure to place plaintiffs on H2C's board of directors, because thereafter "they continued to recognize the validity of the contract . . . and controlled the management of the dispensary." Relying on *Spiegelman v. Metropolitan Life Insurance* (1937) 21 Cal.App.2d 299, 301, she argues that "[s]uch conduct constitutes a waiver." The portion of *Spiegelman* cited states that "it is well settled that when an insurance company, after knowledge of any default for which it might terminate a policy, enters into negotiations which recognize its continued validity, the right to claim a forfeiture for such default is waived." (*Ibid*.) Even assuming that an 85-year-old insurance case has any bearing here, Chadwick cites no evidence to support her assertions about plaintiffs' conduct. Accordingly, her argument is forfeited. (See *Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 514 [appellant has burden to demonstrate error with necessary citations to record].)

### E. *The Trial Court Did Not Abuse Its Discretion in Awarding Attorney Fees to Plaintiffs.*

Finally, Chadwick claims the trial court abused its discretion by awarding "excessive" attorney fees. She is incorrect.

The Agreement provided that "the prevailing party" in "any controversy, claim[,] or dispute relating to [the Agreement's] subject matter" was entitled to recover "all of its expenses, including, without limitation, attorneys fees and costs." Plaintiffs filed a bench brief seeking attorney fees of up to $1,619,200, representing $1,012,313 in actual fees with a multiplier of 1.2 to 1.6. The Chadwick defendants opposed, claiming that the number of

15

hours and billing rates were unreasonable, that no multiplier was warranted, and that the trial court should award no more than $450,000 in attorney fees.

In its second statement of decision, the trial court found that plaintiffs were the prevailing parties and entitled to reasonable attorney fees under section 1717. Agreeing with the Chadwick defendants that some of plaintiffs' charges were not reasonably incurred, the court set the lodestar at $998,394.41. The court also concluded that a multiplier of 1.2 was warranted, based on its findings that plaintiffs' attorneys were highly skilled, could not take other matters while litigating the case—which "involved a high degree of difficulty"—and obtained "a high quality result."

Under section 1717, subdivision (a), if a "contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party," the party who prevails in an action on the contract "shall be entitled to reasonable attorney's fees in addition to other costs. [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit." "[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. . . . The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*).) In determining the appropriate figure, a trial court considers " 'a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' " (*Id.* at p. 1096.)

16

"[T]he trial court has broad authority to determine the amount of a reasonable fee" under section 1717. (*PLCM Group, supra,* 22 Cal.4th at pp. 1094–1095.) " 'The "experienced trial judge is the best judge of the value of professional services rendered in [the judge's] court, and while [this] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong" '—meaning that it abused its discretion." (*Id.* at p. 1095.)

Initially, Chadwick appears to suggest that plaintiffs were not the prevailing parties, pointing out that some of their claims were unsuccessful and "the entire 'damages' phase of the trial was unnecessary and ineffective as [plaintiffs] failed to prove *any damages at all* except attorney fees and costs." Chadwick provides no legal authority in support of this claim, and we therefore treat it as forfeited. (See *Gonzalez v. City of Norwalk* (2017) 17 Cal.App.5th 1295, 1311.)

Chadwick also argues that the attorney fees plaintiffs incurred "for inefficient and unsuccessful claims . . . adjudicated after the initial proceedings . . . should have been deducted from the lodestar." She does not identify with any specificity the fees she claims should have been deducted, much less identify where the challenged billings are in the record. Therefore, this aspect of her claim is also forfeited. (See *Shenouda v. Veterinary Medical Bd., supra,* 27 Cal.App.5th at p. 514.)

Finally, Chadwick contends that the trial court abused its discretion by applying a multiplier. She claims that "because the [c]ourt made a finding that the fees were reasonable *without* the multiplier," it had no discretion to increase the lodestar. In fact, on the page of the second statement of decision that she cites, the court found that the *rates* charged by plaintiffs' attorneys were reasonable, not that the lodestar itself constituted a reasonable amount

17

of attorney fees.  As the balance of the statement of decision makes clear, the court then properly considered other relevant factors, including the result obtained and the case's difficulty, to conclude that the lodestar should be increased by a multiplier of 1.2.

Chadwick claims that the use of a multiplier was also improper because the Agreement did not authorize the prevailing parties to recover more than the amount of attorney fees actually incurred.  She argues that "parties do not have the power to be awarded attorney fees greater than the amount they incur unless they 'specifically agree that the court shall have the power to award attorney fees in an amount greater than the prevailing party actually incurs.' " (Quoting *San Dieguito Partnership v. San Dieguito River Valley Regional Etc. Authority* (1998) 61 Cal.App.4th 910, 919.)  Her quotation of *San Dieguito* is misleading, as the appellate court stated that it "*need[ed] not decide* in this case whether the parties to a contract may specifically agree" to an award of attorney fees greater than those incurred.  (*Ibid.*, italics added.)  Rather, the decision held only that an award of attorney fees is so limited if the contract provides that "the prevailing party shall be entitled to an award 'in the amount of attorneys' fees and costs incurred' " (*ibid.*), and even that holding was later undermined by *PLCM Group*.  (See *PLCM Group, supra,* 22 Cal.4th at p. 1097, fn. 5.)  Regardless, no such language appears in the Agreement, and the case law makes abundantly clear that a trial court has discretion to adjust upward the amount of attorney fees actually incurred to reflect "the fair market value for the legal services provided."  (*Id.* at pp. 1095–1096.)

In short, Chadwick fails to demonstrate that the trial court abused its discretion in awarding attorney fees to plaintiffs.  Thus, this claim also fails.

18

# III.
## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

_____

Humes, P.J.



WE CONCUR:




_____

Margulies, J.




_____

Devine, J.*




      *Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*Counts v. Chadwick*  A163282