Filed 2/8/16  Righetti v. Braddock & Logan Group III CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MILTON RIGHETTI et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BRADDOCK & LOGAN GROUP III L.P., <br><br> Defendant and Appellant. | A136930 <br><br> (Contra Costa County <br> Super. Ct. No. MSC0802209) |

Plaintiffs Milton Righetti and Matthew Righetti (when referred to collectively, the Righettis) are lawyers; they are also experienced in real estate, their family having owned significant property in Contra Costa County for at least 30 years.  In connection with their attempt to acquire an adjacent 49 acre parcel, the Righettis entered into a contract with Braddock & Logan Group III L.P. (B&L).  The contract was lengthy and detailed, with exhibits that included other contracts.  As part of the effort to acquire the adjacent parcel, B&L entered into another contract with the owners of that parcel.  And in their pursuit of the adjacent parcel, the Righettis advanced over $900,000 for costs and fees, B&L even more.

The deal for the adjacent parcel fell through, and the Righettis sued B&L, claiming among other things that their contract was illegal under the Subdivision Map Act, and seeking return of the monies advanced.  Following a bench trial, the court concluded that the contract was illegal, but that the Righettis were in pari delicto.  The trial court thus denied the Righettis any recovery.  It also denied B&L attorney fees.

1

The Righettis appeal, and B&L cross-appeals. We conclude that neither appeal has merit, and affirm.

**BACKGROUND**

**The Complaint and the Pretrial Proceedings**

On September 4, 2008, the Righettis filed a complaint against B&L, alleging five causes of action: (1) violation of the Subdivision Map Act (SMA); (2) money had and received; (3) declaratory relief; (4) breach of fiduciary duty; and (5) violation of Business and Professions Code section 17200.

The complaint was straightforward: B&L had entered into a "Sale Contract" with a third party to purchase 48.9 acres of land (the Anderson Property); B&L entered into a written contract with the Righettis purporting to sell them a portion of the Anderson Property; the Righettis advanced over $700,000 in deposits and $200,000 in costs in connection with their "joint business enterprise" with B&L; B&L refused to sign an amendment to the sales contract unless the Righettis agreed to substantially revise their position; and, as a result, the sales contract lapsed, and the Righettis lost the money they had advanced. Neither contract referred to was attached to the complaint. The thrust of the Righettis' complaint was that their contract with B&L violated the SMA and, as a result, the Righettis were entitled to recover the monies they had advanced.

As will be seen, the facts and the voluminous documents that would come out at trial painted a far more complex picture, one in which the Righettis were significant players—and significantly responsible for what occurred.

The case was assigned to department 16, the Honorable Thomas Maddock. Following B&L's answer, a case management conference was held with Judge Maddock on June 10, 2009, at which B&L advised that it would file a motion for summary judgment. Against that background, the case was set for trial on January 25, 2010 in department 16.

It developed that the Righettis would also be filing a motion, for summary adjudication, and so by stipulation, the parties agreed to expedited hearing on the motions and a briefing schedule. Both anticipated motions were filed on October 30. The

2

Righettis' motion sought summary adjudication on their first, second, third, and fifth causes of action, that is, all but the claim for breach of fiduciary duty. B&L's motion sought summary judgment or summary adjudication, essentially arguing that the contract did not violate the SMA.

Both sides filed their oppositions, both of which included objections to evidence. Both sides filed replies.

The motions came on for hearing on December 18, prior to which Judge Maddock had issued a tentative ruling favoring the Righettis. At the conclusion of the hearing, Judge Maddock took the motions under submission. On January 5, 2010, Judge Maddock issued his decision, followed three days later by a modified final decision, ruling for the Righettis, though not to the full extent as in the tentative ruling. The essence of his decision was as follows:

"Plaintiffs' Motion for Summary Adjudication of the 3rd cause of action for declaratory relief is *granted*. Plaintiff is entitled to a judicial declaration of the following matter:

"The Agreement for Assignment of Partial Interest in Purchase Agreement for Real Property and Agreement for Sharing Costs in Development of Real Property is subject to the Subdivision Map Act. Complaint paragraph 27-28.

"However, the request for damages in the amount of $900,000.00 is inappropriate for declaratory relief."

Judge Maddock went on to explain the basis of the ruling, and then held as follows:

"Plaintiffs' Motion for Summary Adjudication of the 1st, 2nd, and 5th causes of action is *denied.* The Court may not grant summary judgment in favor of a plaintiff on a cause of action for monetary damages when the issue of the amount of damages remains unresolved. *Department of Industrial Relations v. UI Video Stores, Inc.* (1997) 55 Cal.App.4th 1084, 1097; PUMFs 15-16.

"The Court notes that Plaintiffs did not seek Summary Adjudication of the 4th cause of action for breach of fiduciary duty.

3

"The action shall proceed as to the causes of action . . . remaining. (Code Civ. Proc., § 437c, subd. (n)(1).) Thus, the amount of Plaintiffs' damages, if any, will be determined following trial of the remaining causes of action. See also, Code Civ. Proc., § 904.1 [The 'one final judgment rule.']"

Then, following his ruling on the objections to evidence, Judge Maddock concluded as follows:

"In light of the Court's ruling on the Plaintiff's Motion for Summary Adjudication, above, the Defendant's Motion for Summary Judgment is *denied*.

"Defendant's Motion for Summary Adjudication of the fourth cause of action for breach of fiduciary duty is *denied*."

Meanwhile, at a January 7 hearing, Judge Maddock ordered that trial was confirmed for January 25, and that it would be before another judge—that, "as of January 19, 2010 all matters in this action shall be heard by the Honorable Cheryl Mills, Dept. 19."

The trial date was thereafter continued, Judge Mills having been recused, and the case was reassigned to department 2, the Honorable Barbara Zuniga. Various amended pleadings followed, and at an August 23, 2010 hearing before Judge Zuniga, "due to unavailability of the court the trial date is reset. Counsel agree that it will be a court trial," set for February 14, 2011.

**The Trial—And the Unusual Order**

For reasons unexplained in the record, the case was reassigned yet again, to department 33, the Honorable Steven Austin, before whom it came on for "pre-trial setting" on February 16. There, among other things, Judge Austin "confirm[ed] the prior order of Judge Maddock as to the assignment agreement being void." Judge Austin also ruled on motions in limine and set the matter for trial for May 2. And on that date trial began on the Righettis' remaining causes of action (the breach of fiduciary duty claim having been dismissed).

The trial was brief, lasting less than three days, resulting in a reporter's transcript of only 288 pages. The Righettis called only three witnesses: Milt Righetti, Jeff

4

Lawrence from B&L, and Robert Miller, who had provided some legal services to B&L. B&L called only Mr. Righetti under Evidence Code section 776, whose total testimony comprised over 85 percent of the transcript.

While the oral testimony was brief, the documentary evidence was extensive, with 79 exhibits, comprising hundreds of pages, admitted into evidence. With that, the evidence was complete.

According to the register of actions, Judge Austin ordered that "counsel shall prepare briefs and closing arguments shall be held on 5-25-11 . . . ." Those briefs were filed and the argument held and reported, though no transcript of it is in the record. At that point, the case was taken under submission.

Then, with the case under submission, on August 10, Judge Austin filed a most unusual order. It began as follows:

"The Court is considering overturning on its own motion the Modified Final Decision filed on January 8, 2010 granting Plaintiffs' Motion for Summary Adjudication of the 3rd Cause of Action for declaratory relief in which Judge Maddock ruled that Plaintiffs were entitled to a judicial declaration of the following matter:

" 'The Agreement for Assignment of Partial Interest in Purchase Agreement for Real Property and Agreement for Sharing Costs in Development of Real Property is subject to the Subdivision Map Act. Complaint paragraphs 27-28.'

"A trial court has inherent authority to correct an erroneous ruling on its own motion no matter how it acquires that belief. *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1108 [(*Le Francois*)]; *In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301, 1308. 'This authority derives from the judiciary's fundamental, constitutionally mandated function to resolve specific controversies between parties.' *Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1248."

After discussing the basis for reconsidering Judge Maddock's January 8, 2010 ruling, Judge Austin's order ended with the observation that he believed the issue had been well briefed earlier, but invited the parties to submit further briefs if they wished.

The parties briefed the issue and the matter came on for hearing on September 8. The hearing was extensive, with much of the discussion addressing the facts and holding in *Le Francois, supra,* 35 Cal.4th 1094, which arose out of the setting where a trial court denied defendants' motion for summary judgment. More than a year later, defendants again moved for summary judgment on the same grounds before a second judge. The second judge granted the motion, and the Court of Appeal affirmed, holding that the second judge had inherent constitutional authority to " ' "reconsider the prior interim ruling and correct an error of law on a dispositive issue." ' " (*Id.* at p. 1097.)

The Supreme Court reversed, holding that the trial court had erred in granting an impermissible order under the applicable statutory law. But, the Supreme Court further held, while the statutes limited that parties' ability to file repetitive motions, it did not limit the trial court's ability, on its own motion, to reconsider interim orders and correct its own errors. (*Le Francois, supra,* 35 Cal.4th at p. 1108.) So, the Supreme Court remanded the matter for further proceedings. (*Id.* at p. 1109.) And as particularly pertinent here, the Supreme Court added this footnote 2: "The Court of Appeal held that because the motion was transferred [to the second judge] without objection, plaintiffs could not challenge the propriety of that transfer on appeal. This issue is not before us on review, and we express no opinion on when and under what circumstances one judge may revisit a ruling of another judge." (*Id.* at p. 1097.)

While much of the hearing was about *Le Francois,* counsel for the Righettis reminded Judge Austin of his pretrial ruling that the case would be "tried based upon the ruling made by" Judge Maddock. Judge Austin said he understood, and saw that "as a second problem" if he were to change Judge Maddock's ruling. Judge Austin ended the hearing with the observation that he understood the parties' positions and saw "the potential benefits and potential problems" were he to reverse Judge Maddock's ruling.

**The Statement of Decision**

The next thing in the record is Judge Austin's tentative decision filed November 30, 2011. It began as follows: "For the reasons set forth below, all of the Plaintiffs' claims are barred by the doctrine of In Pari Delicto. The court declines,

however, to alter Judge Maddock's decision to grant summary adjudication related to the application of the Subdivision Map Act to void the Agreement for Assignment of Partial Interest in Purchase Agreement for Real Property and Agreement for Sharing Costs in Development of Real Property."

The tentative decision went on for five pages explaining why Judge Austin reached the conclusion he did, ending with the statement that the tentative decision will become the statement of decision unless a party requests a statement of decision.

The Righettis requested a statement of decision. And that they got, a 23-page decision discussing in detail the evidence and documents at trial, which statement incorporated by reference 70 findings of fact. That statement was devastating to the Righettis' claim in all respects—and scathing in its comments on Milt Righetti's credibility.

We need not recite most of Judge Austin's findings, as they are not necessary to our discussion of the issues here. We do quote his lengthy "Summary" of his "Findings of Fact," which describes the setting well:

"Summary of the Court's Findings of Fact.

"The Court's Findings of Fact, including citations to the supporting evidence and where appropriate the Court's findings concerning the credibility of witnesses with regard to specific testimony, are set forth separately and incorporated by reference. The following summarizes the Findings of Fact and any additional inferences and conclusions drawn by the Court.

"The evidence is very clear that the Righettis were the driving force behind the idea to purchase the Anderson Property. The Righetti family owned a large parcel (the 'Righetti Property') adjacent to the Anderson Property. Milt Righetti had been working to develop their parcel for approximately 30 years prior to the subject transaction. The Righettis both firmly believed that if they were to own portions of the adjacent Anderson Property their chances of obtaining approval for the development of their parcel and successfully developing it would increase significantly. Findings of Fact ('FF'), Nos. 1–8, 13–14.

7

"Prior to the time that Braddock & Logan was involved in this potential purchase of the Anderson Property, Milt Righetti and another adjoining landowner, Bob Branaugh, had initiated negotiations for the purchase with Mr. Anderson. Only after Mr. Anderson expressed interest in the deal did the Righettis bring Braddock & Logan into this potential transaction. Thereafter, the Righettis worked jointly with Braddock & Logan to craft the terms of both the Letter of Intent and the Purchase and Sale Agreement (the 'PSA'). By their own admission, both Matt and Milt Righetti are experienced real estate developers who are both attorneys and Milt Righetti is a licensed real estate broker, and a real estate attorney with more than 30 years of experience. He is knowledgeable about the process of subdividing properties in California, and had experience working on development issues with the City of Dublin, where both the Anderson and Righetti Properties were located. FF, Nos. 1, 9–16.

"Mr. Anderson was known to have a history of difficult relationships with prospective buyers of the Anderson Property, and therefore both the Righettis and Braddock & Logan believed it was important to get the Anderson Property under contract as quickly as possible. However, the Righettis still had not determined the form and financial arrangements they would use to participate in acquiring the Anderson Property. Therefore, the Righettis agreed that Braddock & Logan would be responsible for negotiating the PSA with Mr. Anderson as the 'Buyer', and that the Righettis would later become parties to the PSA as permissive assignees. FF, Nos. 10, 15–21.

"Milt Righetti was provided with drafts of the PSA by Braddock & Logan prior to the time that it was executed. The documentary evidence is that he thoroughly reviewed them and commented on specific proposed terms. Significantly, Milt Righetti requested and obtained, on behalf of himself and his brother, the inclusion of language assuring that the Righettis could later become parties to the PSA as permissive assignees without further approval by Mr. Anderson. His testimony that he may not have noticed that Plaintiffs were not listed as buyers of the property when he reviewed the PSA prior to its execution was not credible. Neither was his alternate testimony that he may have noticed that Plaintiffs were not listed as buyers of the property prior to its execution and that he

8

objected to Defendant about this omission. Although there is substantial documentation of other changes requested by Milt Righetti to be made to the PSA, there is no documentary evidence that he ever objected to Braddock & Logan that the Righettis were not listed as buyers.

"Milt Righetti's knowledge prior to execution of the PSA regarding whether the Righetti[s'] were listed as buyers was a material and important issue in this case. A central theme of the Righettis' entire case was that Braddock & Logan 'hijacked' this transaction by secretly entering into the PSA with Anderson as the sole buyers without the Righettis' knowledge or approval. They argued that this wrongful conduct strengthened Braddock & Logan's bargaining position with the Righettis when the Assignment Agreement was negotiated and allowed Braddock & Logan to take a 'take-it-or-leave-it' approach to negotiations. Plaintiffs' Trial Brief, pg. 2:6–20. His testimony on this subject was deliberately untruthful. This calls into question the truthfulness of his entire testimony.

"Milt Righetti was credible, however, when he admitted that the omission of Plaintiffs as buyers was 'a big deal' to the Righettis and that he could 'very easily have put our [the Righettis'] name on it, but we didn't.' RT 228: 4–18. The court finds that the Righettis knowingly agreed to the terms of the PSA prior to the time that it was executed and that they did so with the design and intent that the transaction would be structured such that Braddock & Logan was originally the sole buyer and the Righettis were permissive assignees. FF, Nos. 15–21.

"Following the execution of the PSA, the Righettis and Braddock & Logan entered into protracted negotiations regarding the language of the Assignment Agreement. The Righettis did not trust Braddock & Logan, were well aware of their need to protect themselves during negotiations, and did so energetically. The Righettis also negotiated from the perspective of wanting to keep equal control over development of the Anderson Property. The negotiations were at arms' length between parties who were equally sophisticated, knowledgeable, experienced, motivated and of equal bargaining power. The Agreement was modified a number of times and went through a

9

number of drafts. After months of contentious negotiations, the Assignment Agreement was executed in September 2005. FF, Nos. 1, 22–37.

"The interests in the PSA received by each of the parties through the Assignment Agreement were the result of negotiation and compromise, without any overreaching or inequitable conduct by any of the parties. The final result represented the joint work of the parties manifesting their shared interests in this proposed land purchase. Both Braddock & Logan and the Righettis were experienced real estate developers with substantial legal knowledge of the Subdivision Map Act. Although Milt Righetti testified that notwithstanding having experience in doing subdivision work, he had never actually read the SMA, and that he had not 'really' taken care to assure his subdivision work complied with the SMA and did not know the consequences of non-compliance, RT, pp. 41:14–42:24, his testimony in that regard was not credible. In the Assignment Agreement, both sides assumed responsibility for compliance with all legal requirements, they knew compliance with the SMA was required and took care to assure compliance, and neither side believed the Agreement violated the SMA. The Righettis could have walked away from this transaction at any time if they were unhappy with the negotiated terms, but the Righettis went forward with the Assignment Agreement because they believed there were sufficient benefits to them in doing so. FF, Nos. 1, 22–45.

"As the Righettis had expressly intended while negotiating and drafting the Assignment Agreement, after executing the Agreement each party had a direct legal interest in the PSA and each shared the risk that they would lose any funds each party paid to proceed with the Anderson Property purchase should the transaction fail to close in a timely fashion. As the purchase transaction progressed, expenses were incurred and paid proportionately and pursuant to the terms of the Agreement. Braddock & Logan advanced expenses on the Righettis' behalf, for which it was reimbursed by the Righettis after the Righettis had approved the statements of costs to confirm that such costs had been properly allocated between the parties so that the Righettis were only paying for costs which benefited the Righettis alone. Deposits were paid for the benefit of Mr. Anderson, and except for the reimbursement to Braddock & Logan for the Righettis'

10

share of the initial deposit (made prior to execution of the Assignment Agreement), these funds never passed through Braddock & Logan's hands. Braddock & Logan received no other money from Plaintiffs related to this purchase transaction and did not benefit in any way from the payments made by Plaintiffs. All of the payments made by both parties, as detailed in the Stipulation Regarding Payments, were made toward the parties' shared goal of purchasing the Anderson Property and were made by the Righettis and Braddock & Logan for their own respective benefit. The Righettis made clear they were unwilling to pay any share of costs beyond those costs which were paid for the specific benefit of the Righettis and not Braddock & Logan. After the Assignment Agreement was executed, the Righettis nonetheless demanded and received changes in the allocation of costs and deposits which were advantageous to them. No payments made by the Righettis enriched Braddock & Logan, unjustly or otherwise. FF, Nos. 46–58, 65–66.

"There was no evidence that Braddock & Logan engaged in any inequitable or unjust conduct with regard to the negotiation, execution, performance and termination of either the PSA or the Assignment Agreement. When the date set for closing arrived, neither Braddock & Logan nor the Righettis were willing to close and the parties could not agree on an extension. Braddock & Logan was within its rights under the Assignment Agreement in deciding not to close or extend the PSA for its own business reasons. The transaction did not close and both the PSA and the Assignment Agreement lapsed. The Righettis offered no evidence showing any wrongful or inequitable conduct by Braddock & Logan with regard to the failure of the PSA to close. Under the Assignment Agreement, the Righettis had the right to assume Braddock & Logan's position in the PSA by assignment and close escrow on their own, but did not do so. The Righettis lost $735,000 when the PSA failed to close. Braddock & Logan lost approximately $1.4 million. These losses were caused by the collapse of the transaction. FF Nos. 49, 59–67.

"After the PSA failed to close, both parties engaged in new and separate negotiations with Mr. Anderson, and Braddock & Logan even offered to allow the Righettis to participate in a restructured deal if it succeeded in negotiating a new deal

11

with Mr. Anderson. Both parties either suggested or considered using the previous deposits paid to Mr. Anderson as a technique for negotiating a new purchase price, and nobody contends there was anything wrong in doing so. FF. Nos. 61-63." (Bold type omitted.)

Judge Austin's statement of decision distilled his holding as follows: "Based upon the facts as found by the Court and for the reasons set forth herein, the Court holds that the Righettis have not met their burden of proof to show they are entitled to recover anything pursuant to their First, Second and Fifth Causes of action. Further, the Court holds that the affirmative defense of *in pari delicto* asserted by Braddock & Logan also bars the Righettis' claims, and that the Righettis are entitled to no relief on any of their claims."

Judge Austin then went on, cause of action by cause of action, demonstrating why the Righettis failed in the proof as to each of the causes of action. Thus, as to the first, "The Righettis have not met their burden of establishing that Braddock & Logan secured any of the Righettis' money as a result of that void contract and either 'caused' damage to the Righettis or is obligated to make restitution."

As to the second, for money had and received, Judge Austin found, "In addition to the Righettis having failed to establish the elements needed to prove the Second Cause of Action, this claim is also barred by the doctrine of *in pari delicto* . . . ."

And as to the fifth cause of action, based on Business and Professions Code section 17200, Judge Austin found that "[t]he Righettis have not met their burden of proof on this cause of action. They failed to show that Braddock & Logan engaged in an unlawful business practice. The Righettis also failed to show they had standing pursuant to [Business and Professions] Code § 17204 because (a) Braddock & Logan did not induce, compel or require the Righettis to pay money to Braddock & Logan, and (b) both the Righettis' and Braddock & Logan's ultimate loss of money paid toward expenses and deposits was not the result of or connected to any violation of statute, but because all the parties to the PSA were not willing to close on the date set for closing and could not

12

agree on the terms for a further extension.  Therefore, the monetary loss would have occurred whether or not the Assignment Agreement complied with the SMA."

In sum, Judge Austin found that the Righettis lost on all their claims because of a failure of proof.  And also for an additional reason:  "In addition to failing to prove the elements of their causes of action, the Righettis' claims fail because Braddock & Logan successfully established a *in pari delicto* defense."  Judge Austin then devoted six pages of analysis and discussion demonstrating why.

B&L thereafter moved for attorney fees, which Judge Austin denied, as discussed in detail below.  Judgment was entered, including the order denying attorney fees, from which the Righettis filed their appeal, and B&L its cross-appeal.

## DISCUSSION

### The Righettis' Appeal Has No Merit

### 1.    Introduction

The Righettis' opening brief has an introductory "Statement of Issues" that says it presents "the following issues for appellate review:"

"The Righettis entered a contract with B&L to purchase a parcel of property for which a parcel map was required, yet no parcel map was ever recorded.  Is the contract illegal and void, *ab initio*, because it violates the SMA?  ANSWER:  Yes.  [¶] . . . [¶]

"The Righettis were buyers of real property under an agreement that violated the SMA and was void at the time it was entered.  Did the trial court commit reversible error when it barred the Righettis from recovering the monies paid under the agreement, upon finding that:  (1) the parties engaged in no intentional wrongdoing; and (2) an unclean hands defense applied because the parties were *in pari delicto*?  ANSWER:  Yes." (Bold type omitted.)

Then, in the beginning of their argument, the Righettis state they ask us for two things:  (1) "to confirm, consistent with the trial court's summary adjudication ruling, that the Partial Interest Agreement is illegal and void"; and (2) "to determine that because the Partial Interest Agreement is void under the SMA, they are entitled as a matter of law, to the return of all money paid under the contract to restore the *status quo ante*."

13

We do not understand the first "issue" (or the first request), as the issue was decided favorably to the Righettis below. As to the second issue (and its request), we easily reject it, as it fails under settled principles of appellate review—not to mention because it is supported by substantial evidence.

Before turning to a discussion of why, we begin with a few observations about the Righettis' brief, observations we make in light of settled principles of appellate review, many of which we collected and confirmed in *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507. The appellant there, like the Righettis here, filed a brief that set forth the facts favorable to her, as though the trial court's comprehensive fact-based statement of decision did not exist. Such conduct, we said, was "not to be condoned," and went on to describe why:

"California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall '[p]rovide a summary of the significant facts. . . .' And the leading California appellate practice guide instructs about this: 'Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias, and likewise as to the applicable law. [¶] Misstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly "undo" an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case!' (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 9:27, p. 9–8, italics omitted.) [The Righettis'] brief . . . ignores such instruction.

"[The Righettis'] brief also ignores the precept that all evidence must be viewed most favorably to [B&L] and in support of the order. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) This precept is equally applicable here, where Judge [Austin] issued a statement of decision: 'Where statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts

14

will be resolved in support of the determination of the trial court decision.' (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)

"What [the Righettis] attempt[] here is merely to reargue the 'facts' as [they] would have them, an argumentative presentation that not only violates the rules noted above, but also disregards the admonition that [they are] not to 'merely reassert [their] position at . . . trial.' (*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 687; accord, *Albaugh v. Mt. Shasta Power Corp.* (1937) 9 Cal.2d 751, 773.) In sum, [the Righettis'] brief manifests a treatment of the record that disregards the most fundamental rules of appellate review. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal § 365, pp. 421–423, and § 368, pp. 425–426.) As Justice Mosk well put it, such 'factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to it at the trial level, contrary to established precepts of appellate review. As such, it is doomed to fail.' (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399.)" (*In re Marriage of Davenport, supra,* 194 Cal.App.4th at p. 1531.)

In addition to the above infirmities, the Righettis' brief does not even mention, much less address, the first basis on which Judge Austin ruled against them.

### 2.    The Evidence Does Not Compel a Finding for the Righettis

As indicated above, Judge Austin had two separate, and independent, bases for rejecting the Righettis' claims, the first of which was that they failed to meet their burdens of proof. In light of this, another fundamental principle of appellate review comes into play, another principle ignored by the Righettis: " '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Sonic Mfg. Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967.)

15

The Righettis' brief makes no effort to show how the evidence compelled a finding for them as a matter of law. In fact, they do not even discuss any of the elements of any of the three causes of action.

While the Righettis' brief ignores any mention of Judge Austin's first holding, B&L's respondent's brief does not, devoting some six pages to a discussion of the elements of each of the three claims, demonstrating why the Righettis had failed to meet their burden. The Righettis' reply brief does not even acknowledge, must less respond to, B&L's argument. Their appeal necessarily fails.

So, too, because the one argument the Righettis do make—that in pari delicto cannot lie here—has no merit.

### 3.     The Righettis Were In Pari Delicto

To put their argument in context, the Righettis' brief notes in the section on "standard of review" that our review is de novo. This is how they put it: "The Righettis contend the trial court committed prejudicial legal error when it barred the Righettis' SMA claim by application of the doctrine of *in pari delicto*. Again, this issue involves a purely legal question—i.e. may a defendant seller in an action asserting an illegal and void agreement under § 66499.30(b) of the SMA assert *in pari delicto* as an affirmative defense against the buyer. Because this is a purely legal question, the reviewing court considers it *de novo*, without deference to the trial court's ruling or the reasons for its ruling, and instead decides the matter anew."

Then, after a discussion as to why their agreement with B&L was supposedly "void, not voidable," the Righettis go on to assert why they are supposedly entitled to return of the money they advanced, ultimately asserting that Judge Austin's determination that B&L engaged in no unjust or inequitable conduct "should have played no part in the analysis." After all that, the Righettis reach their ultimate argument: that "The Doctrine of *In Pari Delicto* Can Have No Application to The Present Case As a Matter of Law, Where the Righettis Fall Within The Class of Persons to be Protected by the SMA, and Where Application of the Doctrine Would Further an Act Contrary to Public Policy." Or, as they sum it up in their reply, "*In Pari Delicto* Defense Cannot

16

Apply; the Goal and Purpose of the SMA is to Protect Buyers of Real Property; the Righettis were Buyers of a partial Interest in the Anderson Property."

The argument, and the assumption inherent in it, are unsupported: the Righettis were not simple buyers of real property, as Judge Austin specifically found. The Righettis' ipse dixit assertion to the contrary does not change that. And the four cases the Righettis rely on are inapplicable.

*Black Hills Investments, Inc. v. Albertson's, Inc.* (2007) 146 Cal.App.4th 883, and *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549—which the Righettis cite for the proposition that they are protected parties as "buyers of real estate"— both recognize that a principal goal of the SMA is to "protect individual real estate buyers." (*van't Rood v. County of Santa Clara, supra,* 113 Cal.App.4th at pp. 563–564; *Black Hills Investments, Inc. v. Albertson's, Inc., supra,* 146 Cal.App.4th at p. 892.) That does not describe the Righettis, or the setting here.

*Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141 (*Lewis*), and *Smith v. Bach* (1920) 183 Cal. 259, which the Righettis cite in support of their argument that the in pari delicto defense cannot apply because the "very goal and purpose of the SMA is to protect buyers of real property," are similarly unavailing.

It is true that Judge Austin quoted one paragraph from *Lewis* on which the Righettis rely: " '[W]hen the Legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another, a member of the protected class may maintain an action notwithstanding the fact that he has shared in the illegal transaction. The protective purpose of the legislation is realized by allowing the plaintiff to maintain his action against a defendant within the class primarily to be deterred.' "

But Judge Austin went on, quoting other language in the case, including this: " '[H]ow the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved.' " And, he said "under the circumstances of the case, the purposes of the SMA would not be thwarted by application of the *in pari delicto* defense." Then evaluating those circumstances, Judge Austin went on to explain—again,

17

based on the factual findings the Righettis do not challenge on appeal—why the purposes of the SMA would not be thwarted by refusing to allow a recovery to the Righettis. In his words: "Under the particular and unique facts of this case, the Righettis are not in the class of persons requiring protection under the SMA. Not only are they experienced developers, but they insisted that Braddock & Logan acknowledge that fact in the Assignment Agreement. The Righettis sought to purchase the Anderson Property with the goal of joint[ly] developing that Property with, and for the benefit of, the Righetti Property. Both parties are experienced in property development and neither took advantage of the other in drafting and executing the Assignment Agreement. Braddock & Logan did not seek to obtain an advantage from plaintiffs in the execution of the Assignment Agreement and acted fairly in its dealings with plaintiffs. Permitting the Righettis to obtain a remedy from Braddock & Logan would not serve the purposes of the SMA but rather would only work to shift the voluntarily-shared risk of a declining real estate market from one developer on to another developer's shoulders alone. This is squarely contrary to what these experienced, knowledgeable and sophisticated developers bargained for between themselves, and is not a purpose of the SMA."

*Smith v. Bach, supra,* 183 Cal. 259 is likewise unhelpful. What the Supreme Court said there was that: "[W]here money has been paid in consideration of an executory contract which is illegal, the party who has paid it may repudiate the agreement at any time before it is executed and reclaim the money. In such a case it is the duty of the court in furtherance of justice to aid one not *in pari delicto*, though to some extent involved in the illegality, but who, as here, is comparatively the more innocent, and to permit him to recover back money paid on a contract as the circumstances of the case may require." (*Smith v. Bach, supra,* 183 Cal. at pp. 263–264.)

Here, the contract was not executory. The parties were in pari delicto. And B&L received no money or benefit. There was nothing for the Righettis to "reclaim," nothing to "recover back."

The Assignment Agreement here was negotiated over a period of months between experienced, sophisticated people with equal bargaining power, all of whom were aware

18

of the need to protect their own interests—and, as Judge Austin found, did. The draft agreement was modified on numerous occasions before being finally executed, an executed agreement that represented the joint work of both parties. Indeed, Judge Austin went so far as to find that the Righettis were the "driving force" behind the entire transaction, and that the separate Purchase and Sale Agreement and Assignment Agreement had been necessary solely to accommodate the Righettis. The history of the transaction itself, particularly the role of the Righettis as developers pushing this transaction to allow development of the adjoining Property, and the negotiations between the parties, made "[t]he executed Assignment Agreement . . . the joint work of the parties manifesting their shared interests in this proposed land purchase."

Judge Austin also found that "[t]here was no evidence of any inequitable or unjust conduct by [B&L] concerning either agreement." And the Righettis had presented "no credible evidence" to establish B&L was responsible for a violation of law and, in any event, B&L had "more than rebutted" any evidence the Righettis might have presented: "At most, Braddock & Logan's responsibility was equal to, but not greater than, that of the Righettis."

Finally, Judge Austin found none of the payments made by the Righettis were retained by, or were for the benefit of, B&L. Rather, they were either deposits paid directly to the third party through escrow (and never even touched by B&L), or reimbursement to B&L for the Righettis' share of the initial deposit (and so characterized at the Righettis' insistence), or reimbursement to B&L for money advanced by it to third-party vendors for the Righettis' share of entitlement and other costs.

Were all that not enough, B&L lost almost twice as much money as the Righettis, from exactly the same type of expenditures as made by the Righettis. As Judge Austin found: "After executing the Assignment Agreement, Braddock & Logan, on the one hand, and the Righettis, on the other hand, each had a direct legal interest in the PSA and shared the risk that they would lose any funds each party paid to proceed with acquiring the Anderson Property should the transaction fail to close in a timely fashion. The Righettis paid money in the form of deposits, which were paid for the benefit of

19

Anderson, and to pay their own share of expenses incurred and paid to third-party vendors. Braddock & Logan received no other money from the Righettis related to this purchase transaction and did not benefit in any way from the payments made by the Righettis. All payments made by the parties were made toward their shared goal of purchasing the Anderson Property and thus the payments were made by the Righettis and Braddock & Logan for their own respective benefit. *Braddock & Logan was not enriched, unjustly or otherwise, by any payments made by the Righettis.*" (Italics added.)

**B&L's Cross-Appeal Has No Merit**

**1. Introduction**

B&L's brief states that it first appeals from Judge Maddock's order granting summary adjudication. As to that, B&L adds that a "related issue" is whether Judge Austin had the authority to "overturn" the earlier order by Judge Maddock. B&L also appeals from the portion of the judgment incorporating Judge Austin's order denying attorney fees.

**2. Denial of Attorney Fees Was Proper**

Because B&L's latter contention addresses actual developments at trial, we begin with it, an argument B&L describes as follows: "It is well-accepted that, regardless of a party's voluntary participation in the making of an illegal contract, that party is not automatically barred from enforcing the contract or particular provisions thereof from recovering attorneys' fees. This includes a recovery pursuant to the contract's attorneys' fees provision when there is nothing inherently problematic about that clause itself. [Citations.] [¶] But while the superior court gave lip service to this principle, instead of applying it to the undisputed facts, the superior court reverted to the 'expansive' theory of the effect of illegality . . . ." So, the argument runs, Judge Austin erred in denying B&L attorney fees. We disagree.

To put the issue in context, on June 5, 2012, B&L filed a motion for attorney fees and costs on the basis that it was the prevailing party in the action. The motion sought a total of $670,828. The Righettis filed opposition, B&L a reply, and the matter came on for hearing on September 11, 2012.

20

Prior to that hearing, Judge Austin had entered a tentative ruling that, following recitation of the fee provision, noted as follows:

"Contractual attorney's fees may be awarded pursuant to a contract that has been otherwise determined to be unenforceable when 'the forfeiture resulting from unenforceability [of the contract] is disproportionately harsh considering the nature of the illegality.' *Yuba Cypress Housing Partners, Ltd. v. Area Developers* (2002) 98 Cal.App.4th 1077, 1082. Whether attorney's fees should be awarded under the terms of a void contract 'depends on the kind of illegality and the particular facts involved.' *Id.* Such facts and circumstances include 'whether the violation of the law involved serious moral turpitude, *whether the parties are not entirely in pari delicto*, whether the adverse party would be unjustly enriched if enforcement were denied, whether the forfeiture resulting from denial of enforcement would be disproportionately harsh in proportion to the illegality and whether the purpose of the statute violated will be best served by enforcement or denial of enforcement.' *Homestead Supplies, Inc. v. Executive Life Ins. Co.* (1978) 81 Cal.App.3d 978, 990-91 (internal citations omitted).

"Here the court has found that the parties to this void contract were in pari delicto in all respects. In the Statement of Decision the court stated as follows:

" '*In pari delicto* means in equal fault. Equity will not aid one party or another to an illegal transaction where they stand *in pari delicto*, but will leave them just where it finds them, to settle these questions without the aid of the court. *Brown v. Grimes* (2011) 192 Cal.App.4th 265; *Santoro v. Carbone* (1972) 22 Cal.App.3d [721].'

"Because the parties were jointly responsible for this illegal contract, neither can come to the court to enforce its terms, including those related to the award of attorney fees. Moreover, the remaining factors in *Homestead* dictate that neither party be awarded fees in this matter." (Italics added.)

B&L contested the tentative ruling, and the hearing began with its counsel's attempt to address Judge Austin's "in pari delicto perspective," to be quickly met with Judge Austin's response: "No. You were both bad. That's what we found. So you can't come to the Court to enforce terms of a contract that was illegal to begin with, according

21

to Judge Maddock, and get any of the benefits out of that contract. You guys were joined at the hip, equally moving along in your paths at arm's length. You did a really good job of arguing that in your papers and persuaded me that you were right on it. And so there isn't much I can do."

Or, as Judge Austin put it on the next page: "Have you got any case where you're entirely *in pari delicto*, which is what this is, entirely, from the inception. Each side trying to get over on the other one in the contract, which is essentially what you guys were doing, your clients were, throughout the whole drawn-out process as smart driven businessmen, each trying to get a benefit for themselves out of this illegal contract. [¶] Now, do you have any cases like that?"

Counsel cited some cases, one of which supposedly said, as counsel quoted, "the realities of the situation must be considered." Judge Austin responded immediately:

"I think I did. I did consider the realities of the situation. I sat through this trial for a really long time. And I watched as two experienced attorneys represented two experienced developer groups who entered into what Judge Maddock felt was an illegal contract in its very being, in its very purpose.

"And when litigation over that comes forward, I just don't see how possibly you can then say with these experienced people who negotiated the terms—I don't think I've ever had a case with more experienced people involved in negotiating terms of a contract over such a lengthy period of time.

"For them to have gotten together and done this void contract under the Subdivision Map Act and then come back and say, oh, well, except for this part, now I need my fees for dealing with the litigation where the courts were required to go through a lengthy trial on an issue that probably should never have been here.

"In that setting this is completely inappropriate response under the contract. So I have considered those things. And I just don't see that you're entitled to attorneys fees."

And then Judge Austin summed it up in response to counsel's final unsuccessful argument: "I'm speaking not only to you, but other people in the room, about the Court's feelings on this, after having sat through this matter for a lengthy period of time. Not that

I don't enjoy all the parties, I thought it was intellectually challenging and everyone was very good at it, but I'm not saying anything that I think anybody here doesn't believe. So you can go ahead."

As B&L acknowledges, we review Judge Austin's decision to deny attorney fees for abuse of discretion, as we confirmed in *Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1158: a trial court is given wide discretion in determining whether a party has prevailed for purposes of awarding attorney fees. (See generally *Hilltop Investment Associates v. Leon* (1994) 28 Cal.App.4th 462, 466–467; *McLarand, Vasquez & Partners, Inc. v. Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450, 1456 [no abuse of discretion where trial court "apparently concluded that fairness dictated each side should pay its own attorneys' fees"].)

B&L demonstrates no abuse here, not even attempting to challenge any of Judge Austin's pointed comments about B&L's involvement here.

Superimposed on this is that a determining of prevailing party for attorney fee purposes is guided by equitable considerations. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 877.) B&L demonstrates no inequity here, where the parties were, as Judge Austin put it, "joined at the hip." Denial of attorney fees was proper.

### 3. The Summary Adjudication Was Correct

B&L's other argument on its cross-appeal is that the summary adjudication order by Judge Maddock "should be reversed because the Assignment Agreement was not an agreement to sell, lease or finance" property under the SMA.

To briefly recap the background, on January 8, 2010, Judge Maddock filed his modified final decision granting summary adjudication on the Righettis' third cause of action, holding as follows: "The Agreement for Assignment of Partial Interest in Purchase Agreement for Real Property and Agreement for Sharing Costs in Development of Real Property is subject to the Subdivision Map Act." Judge Maddock then went on for several pages explaining the basis for his ruling.

That was the setting in which the case came on for pretrial before Judge Austin in February 2011 where, among other things, he confirmed on the record "the prior order of

23

Judge Maddock as to the assignment agreement being void." And in that posture the case went to trial. Then, after all the evidence was in, Judge Austin issued the order we described as "unusual," indicating a possible interest in revisiting Judge Maddock's order. That led to further briefing, and further argument, all to result in nothing, as Judge Austin's statement of decision ruled that he would not overturn the interim ruling.

That said, for reasons known only to himself, Judge Austin's statement of decision included this:

"**The Summary Adjudication Order**

"Although it appears to this Court that the Assignment Agreement was not violative of the Subdivision Map Act, this Court will not overturn the interim ruling of Judge Maddock granting the Righettis' summary adjudication motion. After considering the authority submitted by the parties in response to the court's request for additional briefing on this subject, it appears that it would be improper for the court to revisit that earlier ruling. While a judge may overturn his own interim rulings on his own motion, a judge is not permitted to overturn rulings made by another judge. *In re Alberto* (2002) 102 Cal.App.4th 421.

"However, after several days of trial and countless hours reviewing the Assignment Agreement from its first proposed iteration to the final executed agreement (a luxury that was not available to Judge Maddock at the time he considered the summary adjudication motion of this complex issue on his busy law and motion calendar), it is very clear to this Court that the agreement is not violative of the Subdivision Map Act." (Bold type omitted.) Judge Austin then briefly set forth, in less than a page, the basis of his conclusion.

Apparently inspired by Judge Austin's extraneous comments, B&L argues that Judge Maddock's summary adjudication order should be reversed. We are not persuaded.

"The Subdivision Map Act is 'the primary regulatory control' governing the subdivision of real property in California." (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996.) And "[t]o enforce its important public purposes, the Act generally

24

prohibits the sale, lease, or financing of any parcel of a subdivision until the recordation of an approved map in full compliance with the law." (*Id.* at p. 999.)

B&L's argument—and, for that matter, Judge Austin's brief explanation—focuses on the fact that the contract was entitled an Assignment Agreement. Thus, it was not a sale, and thus not illegal under the SMA. But there was much more to it than that, as indeed Judge Austin himself found in his statement of decision.

Before turning to a discussion of why, we begin with reference to some observations by our colleagues in Division One, made in *Corrie v. Soloway* (2013) 216 Cal.App.4th 436 (*Corrie*), a case heavily relied on by B&L here. The facts there involved amendments to an option agreement, which the trial court had ruled were ineffectual to cure the illegality of the option for violation of the SMA. Division One reversed, in an exhaustive opinion that discussed the SMA, the policies behind it, and the relevant cases, ultimately to conclude that the option agreement, as amended, was not void or unenforceable on grounds of illegality. Doing so, however, the court made several observations pertinent here, beginning with this quotation: " ' "The illegality of contracts constitutes a vast, confusing and rather mysterious area of the law." ' (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 344, quoting Strong, *The Enforceability of Illegal Contracts* (1961) 12 Hastings L.J. 347.)" (*Corrie, supra,* 216 Cal.App.4th at p. 446.)

The court then went on to observe that "[p]erhaps the best formulation of the approach courts should take in considering defenses based on illegality is found in *Norwood v. Judd* (1949) 93 Cal.App.2d 276 (*Norwood*) . . . . *Norwood* states: 'The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But the courts should not . . . blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered.' " (*Corrie, supra,* 216 Cal.App.4th at pp. 448–449.)

25

Citing *Corrie*, B&L asserts that "Applying ' "the realities of the situation," ' Division One held the option agreement enforceable in its final iteration, notwithstanding the taint of 'its relationship to the original 2004 Option Agreement which did not comply with' the SMA." We conclude otherwise, that "the realities of the situation" demonstrate that Judge Maddock was right.

Those realities demonstrate that what was involved here was more than just an Assignment Agreement. No, the Assignment Agreement must be read in context, context that includes the Letter of Intent and Purchase and Sale Agreement for the Anderson Property, which was the basis for the Assignment Agreement in the first place. Thus, for example, the recitals begin with the representation that "This Assignment is made with respect to various rights and duties pursuant to the above described Purchase Agreement, a copy of which is attached hereto as Exhibit A, concerning that certain real property located in Alameda County, California (the 'County'), consisting of approximately 48.9 acres, identified as County Assessor's Parcel No. 905-0001-006-03 and more particularly described in Exhibit B hereto (the 'Property')."

The recitals also state that "[t]he parties intend that this Assignment satisfy the rights and obligations of Milt Righetti with respect to the Letter of Intent and Milt Righetti has elected to nominate Matthew Righetti as an assignee along with himself." And, the Assignment states, "Righetti agrees to assume all obligations of Buyer with respect to the Commercial Portion of the Property pursuant to the Purchase Agreement."

The language of the Assignment Agreement clearly evidences the intention of B&L to retain for itself the residential portion of the Anderson Property, while transferring a 50 percent interest in the commercial portion to the Righettis at the close of the Anderson Purchase Agreement. Thus, paragraph E of the recitals, which states that "[B&L] has a particular use and value for the Residential Portion of the Anderson Property and will not assign to Righetti any rights to purchase or seek entitlements for the Residential Portion of the Anderson Property and Righetti will not obtain any rights with respect to the Residential Portion of the Anderson Property pursuant to this Agreement." This is also clear from paragraph 1 of the agreement itself, which states that: "[B&L]

26

will assign to Righetti and Righetti will accept the assignment of the right to purchase one-half of the Commercial Portion of the Anderson Property. [B&L] is not assigning any interest in or to the Residential Portion of the Anderson Property pursuant to this Agreement."

In sum, the Assignment Agreement was part of an overall transaction made in connection with the Anderson Property, by which B&L would sell a 50 percent interest in the commercial portion of the Anderson Property, while retaining for itself a 100 percent interest in the residential portion of that property.

Judge Austin specifically found "The Righettis and Braddock & Logan jointly attempted to purchase the Anderson Property, jointly agreed upon the language of the PSA that made Braddock & Logan the sole buyer and the Righettis permissive assignees, jointly drafted the Assignment Agreement and jointly contributed all funds for the ill-fated attempt to purchase the parcel."

Perhaps best describing what is involved here comes from B&L's own description in its reply brief. There, B&L claims there is no support for the Righettis' position here, where, in B&L's words, "two developers (here, Braddock & Logan and the Righettis, per the recitals and terms of the Assignment Agreement itself) jointly purchase property from a third party and agree between themselves on jointly developing the property after acquisition . . . ." Those are "the realities of the situation."

We turn last to what B&L calls a "related issue," which in essence contends that Judge Austin's conclusion "that he could not do anything about" Judge Maddock's prior ruling was erroneous. And, B&L asserts, we should rule that he had "inherent authority to reverse Judge Maddock's prior summary adjudication" ruling. The argument goes on at length discussing *Le Francois*, and what B&L claims it allows a second judge to do in the face of an earlier ruling on summary judgment by a different judge. Doing so, B&L puts particular emphasis on footnote 2, where the Supreme Court noted it expressed "no opinion on when and under what circumstances one judge may revisit a ruling of another judge." The argument cannot succeed.

27

B&L's fundamental contention assumes a second superior court judge can overrule an earlier ruling by another superior court judge. B&L cites no authority for that assumption, and what authority exists holds expressly to the contrary. This was most recently confirmed in *In re Marriage of Oliverez* (2015) 238 Cal.App.4th 1242, where the Court of Appeal held that a second judge erred in reconsidering an earlier judge's ruling that a settlement was unenforceable, on the basis that the prior ruling was " 'improvident and erroneous.' " (*Id.* at p. 1246.) After discussing when reconsideration was appropriate, and then the holding of *Le Francois*, the Court of Appeal reversed, as the second judge "merely disagreed" with the prior decision.

Moreover, there is the fundamental problem, as Judge Austin himself acknowledged, that the second judge may well have before him or her a much different setting in which to rule than did the judge ruling on the summary judgment. Or, as Judge Austin put it, he had "a luxury that was not available to Judge Maddock at the time he considered the summary adjudication motion of this complex issue on his busy law and motion calendar." Summary judgment rulings would have little meaning if such subsequent evidence were allowed to reverse them.

In any event, even assuming B&L could persuade us that a second judge *may* rule differently from the first judge—a burden it has not met—B&L's position in essence contends that a second judge *must* rule. Here, as noted, Judge Austin refused to rule. That certainly cannot be error. B&L's related argument has no merit.

## DISPOSITION

The judgment is affirmed. Each side shall bear its respective costs on appeal.

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Miller, J.